INTERNATIONAL LONGSHOREMEN'S
ASSOCIATION, AFL–CIO, Petitioner,

v.

WEST GULF MARITIME ASSOCIA-
TION, Respondent,

Council of North Atlantic Shipping
Associations, Intervenor.

No. 84 CIV 4594 (LBS).

United States District Court,
S.D. New York.

Oct. 4, 1984.

Thomas W. Gleason, New York City, for petitioner; Ernest L. Mathews, Jr., New York City, of counsel.

Healy & Baillie, New York City, for respondent; Howard M. McCormack, George M. Leing, New York City, of counsel.

Clifton, Budd, Burke & DeMaria, New York City, for intervenor; Kevin J. McGill, Carlyle M. Dunaway, Jr., New York City, of counsel.

---

\* This Opinion is a stylistically revised version of an Opinion delivered orally on August 29, 1984.

**1.** Since the Emergency Hearing Panel is a joint labor-management committee, its decisions are not, strictly speaking, arbitration awards. However, they are entitled to enforcement or subject to being vacated in the same manner as arbitra-

## OPINION

SAND, District Judge.\*

The International Longshoremen's Association (hereinafter the "ILA") has petitioned this Court to confirm and enforce an arbitration award made by the ILA-Management Emergency Hearing Panel (hereinafter the "Emergency Hearing Panel," the "EHP," or "the Panel") at its June 12, 1984 meeting in New York City.[1] Respondent West Gulf Maritime Association (hereinafter "WGMA") seeks, in turn, to have the award vacated. The Council of North Atlantic Shipping Associations (hereinafter "CONASA") has intervened on behalf of Respondent. The action is based on § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and the United States Arbitration Act, 9 U.S.C. §§ 9 and 10. For the reasons discussed below, we remand the matter to the Emergency Hearing Panel for further proceedings not inconsistent with this Opinion.

### Background

Petitioner ILA, Respondent WGMA, and Intervenor CONASA are signatories to a series of collective bargaining agreements between the ILA and a coalition of seven multi-employer shipping associations. These agreements, which pertain to longshore operations in 36 ports ranging from New England to Texas, are known collectively as the Master Contract. Among the provisions of the Master Contract is one that establishes the Emergency Hearing Panel—a panel comprising representatives of the ILA and the signatory shipping associations whose function it is to resolve disputes relating to the containerization provisions of the Master Contract.

At a meeting held on June 12, 1984, in New York City, the Panel heard a grievance brought by Local 20 of the ILA

tion awards. *See, e.g., General Drivers, Warehousemen & Helpers, et al. v. Riss & Co., Inc.,* 372 U.S. 517, 519, 83 S.Ct. 789, 791, 9 L.Ed.2d 918 (1963).

For purposes of simplicity and convenience, the Panel's decision will be referred to as an arbitration award in this Opinion.

against WGMA. According to the minutes of the meeting, the following events transpired.[2] The grievance alleged that WGMA's practice of requiring members of the ILA's 20-man containerization gang to function as Port-O-Packer operators, rather than hiring additional men to operate the machines, violated the Master Contract's requirement that the minimum size of a container gang be 18 men plus two drivers. After some discussion, a motion was made by an ILA representative "that the gang size shall be 18 plus two with drivers added to the twenty." A vote was then taken. *See* Minutes of the June 12, 1984 meeting, Exhibit B to the Affidavit of William J. Detweiler, at Item 6.

Nine ILA representatives were present at the meeting, and all nine voted in favor of the motion. Nine management representatives, including an alternate, were present and eight of those representatives (including the alternate) voted against the motion. The vote of the ninth representative, James Costello, is recorded in the minutes as an asterisk with the explanation that: "When polled, Mr. Costello stated that he would abstain from voting. However, he subsequently stated that he would stand by the Master Contract. This was considered to be a vote in favor of the Motion." In addition, the minutes indicate that although the alternate voted 'no,' "it was subsequently determined that alternates were not entitled to cast a vote." *Id.*

The minutes then reflect that amid a discussion following the vote, Co-Chairman Dickman stated that a "motion has been made and carried." The minutes end by recording the following resolution together with a request by Co-Chairman Gleason that it be circulated to all carriers, Port Associations, and ILA locals:

"RESOLVED: That in accordance with the provisions of the Master Collective Bargaining Agreement, negotiated by and agreed to by the parties, the minimum size

of a container gang shall be 18 men plus two drivers and that should additional drivers be required, such drivers are to be drawn from outside the gang and shall not be part of the regular 20-man gang." *Id.*

Two days later, notice of the resolution was issued in a memorandum signed by Co-Chairman Dickman and Gleason. *See* Exhibit 3 to Petitioner's Notice of Petition. In the weeks that followed, letters of protest were sent to Co-Chairman Dickman by representatives of various shipping associations. *See* Exhibit D to the Affidavit of William J. Detweiler.

On July 16, 1984, the ILA applied to this Court for an order confirming and enforcing the June 12th award. WGMA filed a cross-motion to dismiss the petition for lack of in personam jurisdiction or, alternatively, to have the action transferred to the United States District Court for the District of Texas. Oral argument was heard on the motions on August 9, 1984, and Respondent's cross-petition to dismiss or transfer the action was denied. The parties were instructed to brief the merits of the petition, and to return for additional oral argument on August 23, 1984. On August 14, 1984, the parties consented to the intervention of CONASA, one of the other signatories to the Master Contract, on behalf of Respondent WGMA.

On August 16, 1984, the Emergency Hearing Panel met again in New York City. At that meeting, James Costello reported that the minutes of the June 12th meeting did not accurately reflect his vote, and he asked that the minutes be corrected to reflect that he had abstained. *See* Minutes of the August 16, 1984 meeting of the EHP, Exhibit 12 to the Second Affidavit of Walter A. Niemand at p. 3.

Mr. Costello's description of the June 12th vote is recorded in the August 16th minutes as follows:

---

**2.** As will be discussed below, the accuracy of these minutes has been challenged at various times by representatives of both management and labor. The use of the minutes here is intended only to provide a general introduction

to a complicated labor dispute and does not constitute a finding that they are an accurate reflection of what in fact transpired at the meeting.

"When the vote was first called, and after Mr. Remsen Whitehouse clearly stated no, I clearly stated that I stand by the language of the master contract, which is 18 men plus 2 drivers. After much conversation, Mr. Bowers was asked to reiterate his motion, at which time, I subsequently abstained."

*Id.* The minutes of the August 16th meeting then reflect that a motion was made and carried to correct the June 12th minutes to reflect an abstention on the part of Mr. Costello. No indication was given as to what effect, if any, this correction had on the result of the June 12th vote.

The August 16th meeting of the Emergency Hearing Panel was not attended by any representatives of the ILA. According to the minutes of that meeting, a written statement had been received from the ILA with a request that it be read into the record. The statement was recorded as follows:

"Since the authority of Panel has been raised by the West Gulf that there is *no* Panel, we should table all matters pending a decision of the Federal Court in New York. We would oppose any reconsideration or any amendment of the minutes."

*Id.* The August 16th meeting was adjourned without further action or discussion with respect to the June 12th meeting.

### Discussion

Respondent has raised a number of objections to confirmation of the award issued by the Panel at its June 12th meeting.

At present, we need reach only two. The first objection is that the authority of the EHP to resolve disputes between the ILA and the signatory shipping associations ended on May 9, 1984. The second is that, even if the Panel retained the authority to make awards, the June 12th vote constituted a deadlock under EHP rules and thus no award in fact was made.[3] As to the issue of the existence and authority of the EHP, we resolve the question in favor of the EHP's continued validity. As to the question whether the EHP has in fact rendered a final award under the unusual voting procedures that the parties apparently have adopted, we remand that question to the EHP for its interpretation and determination in the first instance of its own rules.

1. *The Authority of the Emergency Hearing Panel to Resolve Disputes after May 9, 1984*

Respondent first argues that the EHP was created as a response to an injunction entered against the Rules on Containers, and that when the rules were upheld by the Fourth Circuit on May 9, 1984, "the raison d'etre of the EHP ceased to exist," Respondent's brief at 11, and with it, the authority of the EHP to function as a dispute-resolving mechanism.

 This argument is not persuasive. It is true that the Tampa Agreement, which created the Emergency Hearing Panel, suggests that the Panel was intended to be a temporary measure that would see the ports through the uncertainty created by

---

**3.** In addition, Respondent has argued that the notice given to management of the grievance was insufficient; that local grievance procedures had not been exhausted as required by EHP rules; that the grievance itself, in any event, was not a Master Contract issue and thus not properly before the EHP; that the award made by the EHP did not relate to the specific grievance before it; that the Panel failed to consider or allow presentation of pertinent evidence; and that the award was the product of coercion and duress.

It may be noted that in a recent opinion granting a preliminary injunction to enforce an arbitration agreement between the ILA and the Hampton Roads Shipping Association, the Dis-

trict Court for the Eastern District of Virginia resolved in favor of management the issue of whether the grievance in question was a purely local or a master contract concern. *See Hampton Roads Shipping Association v. ILA,* 84 Civ. 500 N, slip op. —— F.Supp. —— (E.D.Va. August 24, 1984). The Fourth Circuit has since stayed the preliminary injunction.

For the reasons discussed below, we do not reach that question nor the further issues implicated by it—namely, whether the characterization of a grievance as a Master Contract concern is one to be made by the EHP, and whether that characterization is one properly subject to judicial review.

the injunction issued against the Rules on Containers. However, paragraph 3 of the Amendatory Containerization Agreement of July 29, 1983 provides that:

> The Management-ILA Emergency Hearing Panel shall also act as the Management-ILA Container Committee and all provisions of the June 19, 1981 Agreement dealing with the implementation and enforcement of the Containerization Agreement shall apply to implementation and enforcement of the Rules on Containers.

*See* Petitioner's Exhibit A–10. Thus, it would appear that whatever their original intent may have been in creating the EHP, the parties subsequently decided that the Panel would continue to resolve disputes even after the injunction against the Rules on Containers had been lifted.

█ In any event, WGMA and the other shipping associations voluntarily participated in the operation of the Panel after May 9, 1984 and specifically in the vote taken by the Panel on June 12. One who voluntarily participates in arbitration will not thereafter be heard to complain that the arbitrator was without authority to act. *See, e.g., Teamsters Local Union No. 533 v. Herbert Fuel Oil & Trucking Co.,* 543 F.Supp. 831 (E.D.N.Y.1982). The actions of the parties leave no room for doubt that the Emergency Hearing Panel was, as of June 12, authorized to resolve disputes between members of the ILA and the signatory shipping associations.

### 2. *Whether an Award in fact was made on June 12, 1984.·*

Respondent's second objection to judicial confirmation of the June 12th award is that under the rules and procedures of the EHP, a majority vote of the Panel is required in order for an award to issue and that a majority vote was not in fact obtained on June 12. This objection focuses on the effect that an abstention has on the voting totals.

Under the procedures of the Emergency Hearing Panel, at least as described to this Court by the parties, labor and management are each entitled to cast eleven votes at a panel meeting *regardless of the number of panel members actually present at the meeting.*[4] Consequently, every vote will result in a deadlock unless a panel member in some fashion "breaks ranks."

It is undisputed that this is accomplished if a panel member affirmatively casts his vote for the other side—that is, if a labor representative casts his vote affirmatively in favor of the management position or vice versa. Petitioner contends that it is also accomplished if a panel member abstains. Respondent counters that an abstention is equivalent to an absence, and that the deadlock on June 12th thus remained unbroken.

The written rules of the Emergency Hearing Panel are silent on the effect of an abstention.[5] Recourse to evidence of past

---

**4.** This is not entirely clear from the formal rules of the EHP. Such a procedure is indeed prescribed for meetings of the Executive Committee of the EHP. *See* Amendatory Containerization Agreement, Petitioner's Exhibit A–10 at paragraph 4. However, the rules governing regular panel meetings, such as the one held on June 12th, specify only that as a general matter each side shall have an equal vote. *See infra* fn. 5. That provision may be interpreted as prescribing an equal number of votes *regardless* of the number of panel members actually present, but it need not be read in this fashion. The minutes of the June 12th meeting reflect some confusion on this point, as do several of the affidavits which have been submitted to this Court. At oral argument, both parties represented that the practice of the EHP was to give each side 11 votes regardless of the number of

panel members actually present. Whether this representation is accurate is another point that can be considered and clarified by the EHP on remand.

**5.** There are relatively few formal rules governing the operation, and, in particular, the voting procedures of the Emergency Hearing Panel. The agreement that created the Panel specifies only that it comprise "an equal number of representatives from each side." Tampa Agreement, Petitioner's Exhibit A–6, Paragraph IV. A subsequent· provision, contained in an agreement executed in Hollywood, Florida, on June 19, 1981, briefly outlines the procedures to be followed by the Panel. With respect to voting procedures, the Hollywood Agreement provides that:

practice, insofar as it has been disclosed to this Court, is likewise unavailing since the issue appears never to have arisen. Indeed, at oral argument on this application, it was stated that the June 12th meeting was the first occasion in the history of EHP when a formal vote was even taken.

As a result, three alternatives are available to this Court: to decide what the effect of an abstention *should be* under EHP procedures; to hold that the EHP itself made that determination at the June 12th meeting; or to remand the matter to the EHP for clarification of its voting procedures. We believe that the third alternative is the only appropriate one in this case.

 It is a commonplace that judicial review of arbitration awards is severely limited. *See, e.g., Local 1078 v. Anaconda American Brass Co.*, 256 F.Supp. 686 (D.Conn.1966). A court cannot reexamine the substance of an arbitrator's decision. *See, e.g., Glasser v. American Federation of Musicians of United States and Canada*, 354 F.Supp. 1 (S.D.N.Y.), *aff'd*, 487 F.2d 1393 (2d Cir.1973). Nor will it readily intervene in the procedural disputes that arise during arbitration. *See, e.g., Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 555–59, 84 S.Ct. 909, 917–19, 11 L.Ed.2d 898 (1964). The role of the courts general-ly is limited to determining whether one of the specific statutory grounds for vacating an award is present in a given case. *See, e.g., Saxis Steamship Co. v. Multifacs International Traders, Inc.*, 375 F.2d 577 (2d Cir.1967). The principle underlying this policy of restraint is that arbitration should be an alternative to litigation, not a source of it, and that it is an alternative that should be encouraged. *See, e.g., Wilko v. Swan*, 346 U.S. 427, 431–32, 74 S.Ct. 182, 184–85, 98 L.Ed. 168 (1953); *Amicizia Societa Navegazione v. Chilean Nitrate and Iodine Sales Corp.*, 274 F.2d 805, 808 (2d Cir.1960).

 Having a court determine whether an arbitration panel has in fact made an award in a given case will not further this goal of minimizing litigation. Indeed, it seems certain to impede it. Moreover, such intervention by the court runs counter to the essential concept of arbitration as a dispute-resolution mechanism that has been chosen by the parties themselves. Thus, we decline to determine on behalf of the Emergency Hearing Panel whether an abstention among the members of an otherwise evenly divided panel breaks or perpetuates the deadlock. It is for the EHP in

---

Management and labor shall each designate eleven representatives to sit on the Panel; a quorum consists of a majority of each side of the panel; each side shall have an equal number of votes; each side shall have the right to designate alternates; a decision of the Panel is rendered by a majority vote thereof and constitutes a final and binding enforceable award; and in the event of a deadlock, the president of the ILA and the president of the New York Shipping Association shall within two days select a third party to break the deadlock.

Petitioner's Exhibit A–8 at Paragraph 6–C.

A month after the Hollywood Agreement was signed, the Emergency Hearing Panel issued its own "Rules of Procedure," which incorporate and elaborate somewhat on the provisions contained in the Hollywood Agreement. The voting procedures are described as follows:

Determination of the Panel shall be rendered by a majority of the Panel, provided that a quorum, of at least one side, is present at the time of voting. Votes must be cast in person, and no proxies may be used except that alternates may vote in the absence of the person whom they represent. If either the Management or the ILA members, or any of them, fail to appear, after notice, the other side may continue the meeting and issue an award which shall have the same effect as if both sides were represented at the meeting.

Exhibit 5 to the affidavit of Walter A. Niemand, at Paragraph G.

Finally, the Amendatory Containerization Agreement of July 29, 1983 added a procedure for the quick resolution of certain disputes by a meeting of the Executive Committee of the Emergency Hearing Panel. At such a meeting, a determination is rendered by a "majority vote of the Executive Committee, each side having an equal number of votes without regard to the number of persons present." Petitioner's Exhibit A–10, at Paragraph 4. These several rules apparently constitute the whole of the formal guidance available as to the voting procedures of the Emergency Hearing Panel.

the first instance to make this determination.[6]

█ Nor is it appropriate on the record in this case to hold that such a determination was in fact made by the Panel at the June 12th meeting. While it is true that Co-Chairman Dickman, a management representative, ruled at that meeting that the motion had carried, it is unclear whether that ruling was based on the knowledge that Mr. Costello intended to abstain, or whether it was based on the impression, arguably erroneous, that Mr. Costello's remark about "standing by the contract" reflected a vote in favor of the labor motion. No offer of proof on this issue has been submitted by Mr. Dickman.

The minutes of the meeting suggest that the ruling was based on the belief that Mr. Costello had affirmatively and explicitly voted in favor of the union. If that is true, then it would appear that no award was made since the petitioner has conceded that Mr. Costello in fact abstained. *See* Reply Affidavit of Thomas W. Gleason at page 24, paragraph 17.

Mr. Costello has since indicated that the minutes do not accurately reflect his vote, and the minutes were accordingly corrected by the EHP at its August 16th meeting.

Unfortunately, no indication was given as to what effect, if any, this correction was deemed to have on the June 12th vote.

The petitioner has argued that "[w]hen the final vote was taken, the panel was well aware that Mr. Costello was abstaining." *See* Reply Affidavit of Thomas W. Gleason at page 24, paragraph 17. This contention, however, is contradicted by petitioner's own earlier assertions to this Court that Mr. Costello had affirmatively voted in favor of the union's position and that this had been "dispositive of the outcome" of the June 12th vote. *See* Affidavit of Ernest L. Mathews, Jr., at page 21, paragraph 17(b).[7] *See also* Affidavit of Thomas W. Gleason at page 11, paragraph 12(b).

On the basis of the record before this Court, we cannot conclude that Mr. Dickman and the rest of the Panel knew that Mr. Costello was abstaining; that Mr. Dickman's statement that the motion had carried was an intentional, if implicit, ruling on the effect of an abstention; and that the rest of the Panel understood Mr. Dickman to be making such a ruling.[8]

The significance to the shipping industry—both labor and management—of the

---

**6.** Even if it were appropriate for this Court to determine what the effect of an abstention should be under the EHP rules, it would be difficult to do so. Certainly, if one looks to the common or usual understanding of abstention, one might conclude that it should be thought of as an absence, that is, a nonparticipation. The voting procedures of the EHP, however, can hardly be described as common or usual.

**7.** The affidavit of Mr. Mathews goes on to say:
Admittedly, the minutes of the meeting which were taken by a secretary and promulgated without review or editing are confusing on this point. They suggest the 9–7 vote with Mr. Costello abstaining. However, the subsequent text dealing with the significance of Mr. Costello's vote confirms what the deponent observed, that his vote was counted for the motion and carried it.
There is no doubt that any management representative who was there would agree that had Mr. Costello *not voted for the motion, the panel would have been deadlocked, no matter how many members were actually present and voting.*

*Id.* at paragraph 17(c) (emphasis added).

**8.** Petitioner has characterized Respondent's argument that an abstention results in a deadlock as an afterthought, citing the absence of evidence that the point was raised at the June 12th meeting or soon thereafter. Respondent, in turn, characterizes Petitioner's argument that an abstention equals an adverse vote as an afterthought, citing its earlier insistence that Mr. Costello had affirmatively voted in favor of the union's position. These objections only reinforce the Court's belief that while the parties now agree that Mr. Costello abstained, that fact was not clearly apparent to the Panel as a whole on June 12, 1984. Indeed, considering the variety of arguments that have been made about the June 12th vote over the course of this application (*e.g.*, whether the number of panel members actually present is of consequence, whether an alternate is entitled to vote, the effect of an abstention, etc.), we are not even convinced that the Panel as a whole has a basic familiarity with EHP voting procedures. Nor is this necessarily surprising since, as noted earlier, June 12 was apparently the first time that the Panel proceeded by formal vote.

order issued as a result of the EHP's June 12th meeting is too great to be supported by no more authority or basis than the confused, ambiguous proceedings of the Panel on that occasion. As a matter of law, which in this instance happens also to be consistent with sound policy as we perceive it, we hold that on the present state of the record we cannot conclude that a valid final and binding award emanated from the June 12th meeting of the EHP.

■ While it is true that "parties contracting for arbitration must be content with its informalities," *see Western Canada Steamship Co. Ltd. v. Cia De Nav. San Leonardo Anglo Canadian Shipping Co., Ltd.*, 105 F.Supp. 452, 453 (S.D.N.Y.1952), the procedures followed cannot be so informal or chaotic that a court called upon to confirm an award has no real assurance that an award in fact was made. The significance of what in fact occurred under the EHP's unique procedure is for the EHP in the first instance to determine with a full appreciation of all the facts and circumstances.

■ Statutory support for this conclusion can be found in Chapter 9 U.S.C. § 10(d), which authorizes a Court to vacate an award "where the arbitrators exceeded their powers or *so imperfectly executed them that a mutual final definite award upon the subject matter was not made.*" (Emphasis added.) The more common occasion for invocation of this provision is where the language of the arbitrator's award is unclear, *see, e.g., Bell Aerospace Co. Division of Textron v. Local 516*, 500 F.2d 921 (2d Cir.1974), or where the award leaves unresolved important aspects of the matter submitted for arbitration. *See, e.g., Michaels v. Mariforum Shipping S.A.*, 624 F.2d 411 (2d Cir.1980). It seems equally applicable, however, in the rare case in which the procedures and circumstances under which a vote was taken are so confused that it is unclear whether the arbitration panel in question reached the requisite consensus for issuing an award. In such a

case, as in the cases cited above, the existence of a "mutual final and definite award" has been cast into doubt, making judicial enforcement inappropriate. Thus, we hold that Chapter 9 U.S.C. § 10(d) requires that an enforceable award be the product of sufficient procedural regularity so as to permit the court to state with confidence that an award indeed was made.

In other cases involving § 10(d) infirmities, courts have not hesitated to remand the matter to the arbitrator for clarification of the award, and their authority to do so is by now a settled principle of federal common law. *See, e.g., Grand Rapids Die Casting Corp. v. Local Union No. 159*, 684 F.2d 413, 416 (6th Cir.1982). Thus, courts have remanded cases with directions to clarify the scope of an award, *e.g., International Association of Machinists & Aerospace Workers v. Southern Pacific Transportation Co.*, 626 F.2d 715 (9th Cir.1980) (whether overtime pay award applied to similarly situated employees as well as the named claimants), or its precise application, *e.g., Teamsters Local v. Penn Transportation Corp.*, 359 F.Supp. 344 (D.Mass.1973) (matter resubmitted to arbitrators to determine how back pay should be calculated and method to be followed in reinstating employees), or even, most notably, whether an award was made at all with respect to a particular issue. *See United Steelworkers of America v. Timken Roller Bearing Co.*, 324 F.2d 738 (6th Cir.1963) (whether back pay was awarded). A remand to the Emergency Hearing Panel is likewise appropriate here.

Accordingly, this matter is remanded for clarification of the effect, under existing EHP rules and procedures, of Mr. Costello's abstention at the June 12th meeting. The clarification to be obtained on the remand will require the EHP to consider and answer a number of questions. The first is whether any understanding as to the effect of an abstention existed among the parties prior to the June 12th meeting, and, if so, the nature of that understanding.

Second, the Panel should consider and determine whether Co-Chairman Dickman in fact understood that Mr. Costello was abstaining, and correctly ruled under existing EHP rules and procedures, that the June 12th resolution had carried. A determination that he did so may be based either on the ground that his ruling accurately reflected a prior understanding among the Panel as to the effect of an abstention, or on the ground that, in the absence of such an understanding, he was authorized by the Panel to issue a ruling on the subject. If the Panel determines that the June 12th abstention was in substance an "adverse vote"—that is, a vote to be subtracted from management's allotment of eleven votes—it would have the consequence of confirming that an award was made at the June 12th meeting.[9]

If these questions are resolved in Petitioner's favor, and Petitioner renews an application for enforcement in this Court, this Court will then have occasion to review the remaining objections raised by the Respondent with respect to enforcement of the award. If the panel determines that a deadlock occurred on June 12th, then the Panel's own procedures on deadlocks determine the subsequent steps to be taken. Finally, if the Panel is unable to agree on the effect of the June 12th abstention, then the consensus required for an award clearly was lacking. In that event, as well, the matter remains open before the Panel, and the Panel members may agree to continue, or to discontinue, discussions aimed at its resolution, or to invoke the deadlock procedures prescribed by the EHP bylaws.

Accordingly, for the reasons stated, the matter is remanded to the EHP for further proceedings not inconsistent with this Opinion.

SO ORDERED.

9. If such an award was made by the Panel, whether that award is subject to further consideration or revision by the Panel is another question, which is for the Panel in the first instance to determine. Unless and until the Panel enter-tains such consideration, its award is final and binding. *See* EHP Rules of Procedure, Exhibit 5 to the Affidavit of Walter A. Niemand, at Paragraph H.