SALT LAKE PRESSMEN AND PLATE-MAKERS, LOCAL UNION NO. 28, Plaintiff,

v.

NEWSPAPER AGENCY CORPORA-TION, a Utah Corporation, Defendant.

Civ. No. C–79–0317.

United States District Court, D. Utah, C. D.

March 5, 1980.

Arthur F. Sandack, Salt Lake City, Utah, for plaintiff.

James S. Lowrie and Suzanne M. Dallimore, Jones, Waldo, Holbrook & McDonough, Salt Lake City, Utah, for defendant.

WINDER, District Judge.

This action arises out of a labor dispute concerning overtime payments to plaintiff-Salt Lake Pressmen and Platemakers (Pressmen) for hours worked prior to 6:00 p. m. on the Wednesday night "zone run," which prints a special supplement to the Thursday morning newspaper for distribution to outlying areas of Salt Lake City. Defendant-Newspaper Agency Corporation (NAC) commenced printing its zone edition in the fall of 1976. Prior to that time, the Wednesday evening shift had been scheduled to begin after 6:00 p.m., but when the zone edition was instituted in September of 1976, NAC changed the starting time for that shift to 4:00 p.m. NAC paid overtime to the workers on that shift for the period from 4:00 to 6:00 p.m., and paid night rate for the period of time worked subsequent to 6:00 p.m. Approximately a year and a half later, in May of 1978, NAC posted notice formally notifying the Pressmen that 4:00 p.m. would thereafter be the shift's regular starting time on Wednesdays, and that overtime would no longer be paid for hours worked between 4:00 and 6:00 p.m. The Pressmen filed a grievance claiming that employee rights had been violated and demanding reinstatement of the overtime and restitution of the amount of lost overtime wages. NAC denied the grievance and the matter was referred to an impartial arbitrator.

Because the parties were unable to stipulate to the issues to be resolved, they agreed to have them determined by the arbitrator. At the arbitration hearing, it was the Pressmen's position that, as the contract defined night work as that performed between 6:00 p.m. and 6:00 a.m., work performed between 4:00 and 6:00 p.m. pursuant to any 4:00 p.m. start, whether scheduled or unscheduled, should be paid for at the overtime rate. Pressmen relied upon Sections

8.1 and 9.1 of their contract with NAC, which provide in pertinent part:

Section 8.1. Day work shall be between 6 a.m. and 6 p.m.; night work shall be between 6 p.m. and 6 a.m. Shifts running from day into night hours, or vice versa, shall be paid for at the night rate. Section 9.1. Overtime is defined as work performed in excess of the unit of hours established for a particular shift . . . Overtime shall also apply to time worked prior to a set starting time.

The Pressmen also maintained (1) that NAC, by paying overtime for the disputed hours for approximately a year and a half, established a binding custom and practice which became an integral part of the agreement between the parties and could not, thereafter, be unilaterally terminated by NAC, and (2) that NAC had unsuccessfully attempted to negotiate language allowing for payment of overtime out of the contract signed between the parties in April of 1978, and by terminating the payment of overtime only one month after that contract was signed, NAC illegally succeeded in accomplishing what it had negotiated for and lost.

NAC maintained throughout the grievance procedure and the arbitration process that the dispute between the parties was not arbitrable because NAC had not violated an express provision of the agreement signed by the parties. It relied on Sections 3.1 and 14.8 of the agreement, which provide:

Section 3.1. Except as specifically limited by explicit provisions of this agreement, the Agency shall continue to have the exclusive right to take any and all actions it deems appropriate in the management of its operation; to maintain the efficiency of the employees and of all operations; to close down the plant or any part thereof and to direct the work force in accordance with its judgment. All inherent and common law management functions and prerogatives which the Agency has not expressly modified or restricted by specific provisions in this agreement are retained and vested exclusively in the Agency.

Section 14.8. The Board of Arbitration shall have no power to add to, subtract from, alter or vary in any way the express terms of this contract nor imply any restriction or burden against either party that has not been assumed by the express language of this contract, nor shall the Board of Arbitration have any jurisdiction to hear and determine any question involving an assignment of work nor any question not involving an express provision of this contract. Any failure or refusal to abide by the terms of this Section shall constitute a waiver by the party who breaks the contract of rights created by this Section, and if the Union is the offending party, it shall lose the right to have any issue arbitrated under this Section, and if the Agency is the offending party, the Union shall be released from its commitment not to strike.

NAC also contended that under the agreement the arbitrator had no authority to hear a dispute involving solely the discontinuance of a past practice, and that the payment of Wednesday overtime did not rise to the level of a binding past practice because NAC had advised the Pressmen and their contract negotiators that the payment was temporary only and would be discontinued when a new contract was signed. Finally, NAC took the position that according to Section 9.1, relied upon by Pressmen and quoted *supra*, it had the duty to pay overtime in this situation only for time worked prior to a set starting time, and that it could schedule any time as a starting time upon giving the Pressmen seven days notice as required by Section 7.2 of the agreement. 6:00 p.m. is the beginning of night work for rate of pay purposes, but, pursuant to Section 8.1 which states "Shifts running from day into night hours, or vice versa, shall be paid for at the night rate," the penalty for scheduling such a shift with proper notice is not payment at the overtime rate, but payment for the whole shift at the night rate. In support of its position, at the hearing NAC introduced evidence that shifts for the offset printing operations are sometimes

scheduled to begin at 3:00 p.m. with no overtime penalty.

In the arbitrator's decision of January 8, 1979, he framed the issues as (1) whether paying overtime during the disputed hours was an arbitrable question; (2) if so, was the discontinuance of paying overtime by NAC a violation of Sections 8 and 9 of the agreement; and (3) if it was in violation, what was the proper remedy. In his decision, the arbitrator gave consideration to what constituted a binding past practice and whether or not the parties had acted, in this case, to create one. However, he determined the critical question to be not whether the practice of paying overtime was established, but "whether control over the continuance of this overtime payment under the *Agreement* remained a matter for unilateral managerial determination." After reviewing the language in the relevant sections limiting his authority, he concluded that while the past practice might have become binding, the parties had jointly negotiated, through insertion of Section 14.8 in their agreement, that he (the arbitrator) had no power to "imply any restriction or burden against either party that had not been assumed by the express language of this contract," nor to "have any jurisdiction to hear and determine any question not involving an express provision of this contract," and denied the grievance.

On January 18, 1979, counsel for the Pressmen moved the arbitrator to reconsider and reverse his decision because his findings were "significantly in error with regard to material facts," *i. e.*, that the "zone run" shift began at 6:00 p.m. and ended at 1:45 a.m., not at 4:00 p.m. and 11:30 p.m. as the decision indicated, and that regular starting times for the night shift could not commence prior to 6:00 p.m. The arbitrator agreed to reconsider his January decision and requested the parties to submit evidence to him regarding hours worked and time paid. NAC responded to the arbitrator:

In your letter of January 20, you request that the Agency agree to set aside your decision of January 8, 1979, pending a review in light of information contained in Mr. Sandack's letter to you dated January 18. At this time we are not agreeing you have jurisdiction to reconsider your decision, but we do believe you are entitled to the information you requested

. . .

On March 19, 1979, the arbitrator issued his second decision which reversed his January decision. By this decision he ruled that the dispute over payment of overtime between 4:00 p.m. and 6:00 p.m. was arbitrable under Sections 8 and 9 of the agreement, and he ordered restitution of the overtime wages. He further stated he would be derelict in his duty if he did not allow reconsideration, despite NAC's concerns over his authority, when the basic facts upon which his first decision was based were erroneous. And in his March decision, he wrote:

Testimony of the Parties at the Hearing was believed by the Arbitrator to be the full factual statement of the pay practice followed for the "zone edition" shift. The original analysis and the Decision of January 8, 1979, proceeded on this assumption. The information requested by the Arbitrator for reconsideration of the January 8 Decision does indicate that material and crucial information concerning the nature of the pay and work practice for the "zone edition" crew, even though they may have been implied, were not made clear to the Arbitrator. Failure to provide a full and clear statement of the pay practice is the fault of both Parties. What is by implication clear to the Parties may not be apparent to a neutral from outside the industry. The Arbitrator does not consider the additional information as new evidence but a clarification of the actual "work practice" and "pay practice" central to the issue before the Arbitrator. Whatever the reason for misconstruing the facts concerning the pay and work practice involving the "zone edition" crew, it is the obligation of the Arbitrator to review fully the facts as clarified by the Parties in order to insure that the Findings and Decision are both equitable and factually relevant to the issue.

NAC served notice of its refusal to abide by the second decision on the grounds that the arbitrator had no jurisdiction to render it and that it was arbitrary, capricious and in excess of the submission agreement. Thereafter, Pressmen filed this action. Both parties have stipulated to the record and have filed cross-motions for summary judgment. It appears that there are no material facts in dispute.

Preliminary to the court's decision in this case is a review of the scope of its jurisdiction. It is fundamental that under the guise of interpreting arbitrability in a collective bargaining agreement the court does not undertake to determine the merits of the underlying controversy. Simply because a court would interpret a contract differently than did the arbitrator is no basis for overruling him. *United Steelworkers of America v. American Manufacturing Co.*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *Westinghouse Elevators of Puerto Rico, Inc. v. S.I.U. de Puerto Rico*, 583 F.2d 1184 (1st Cir. 1978). However, where failure of one party to arbitrate is at issue, the arbitration agreement should be read, if possible, to favor arbitration. *Id.* Such is not the case here. The sole questions for this court to decide here are whether the arbitrator had the authority under the agreement and letter of submission to reverse his January decision and make a second award and whether either decision and award is arbitrary, capricious or exceeds the arbitrator's authority.

Any authority the arbitrator has to settle disputes is created under the collective bargaining contracts and submission agreements, and consequently, there is a strong policy in favor of finality of arbitration decisions in order that disputes be settled amicably and quickly. *Id.*, and *accord*, 29 U.S.C. §§ 171, 173(d). When the arbitrator renders his final award, his power under the agreement is exhausted, and, unless his subsequent attempts to act under the agreement and submission fall within a few very narrow categories discussed below, they are null and void. Updegraff, *Arbitration and Labor Relations*, 116 (3d Ed. 1970), and cases cited therein; *Paperhandlers v. U. S. Trucking Corp.*, 441 F.Supp. 469 (S.D. N.Y. 1977), *appeal dismissed for lack of jurisdiction*, 578 F.2d 1369 (2d Cir. 1978). At common law, the grounds for attacking an award are generally limited to (1) fraud, misconduct or partiality on the part of the arbitrator, (2) fraud or misconduct by one of the parties affecting the result, (3) no jurisdiction in the arbitrator, or his failure to decide the controversy within the bounds of his grant of authority, or (4) violation of public policy. It is clear that a mistake of fact or law is not a basis for disturbing an arbitrator's award. *Paperhandlers, id.; Washington-Baltimore Newspaper Guild v. Washington Post Co.*, 143 U.S.App.D.C. 210, 442 F.2d 1234 (D.C. Cir. 1971); Elkouri and Elkouri, *How Arbitration Works*, 37, 38 (3d Ed. 1973). The policy of the common law is also reflected in statutory form allowing a District Court to vacate an arbitration award for basically the same reasons. *See*, 9 U.S.C. § 10.

In this case, the arbitrator stated in his second decision and award, "In his letter of January 18, 1979, to the Arbitrator requesting reconsideration of the Decision, the attorney for the Union noted: 'Your findings are significantly in error with regard to material facts.' *It was on this basis and this basis alone that the Arbitrator granted the petition for reconsideration.*" (emphasis added). It should be noted that a review of the transcript of the arbitration hearing discloses that all parties had ample opportunity to present all evidence they deemed relevant. Under the authorities previously cited, it is clear that the arbitrator's statement, standing alone, cannot constitute sufficient grounds for his reconsideration and subsequent decision, and it is therefore, void. In his motion for summary judgment, however, counsel for Pressmen advances several arguments supporting the

second award and this court will quickly review each of these.

First, Pressmen argue that the second decision was actually the only one rendered by the arbitrator because his first decision was in reality a refusal to arbitrate the parties' dispute. That argument is quickly dismissed by a reading of the first decision and award, the last line of which states:

DECISION

This Grievance is denied.

Pressmen cite *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* *supra,* as authority for the duty to arbitrate, but they fail to differentiate between the refusal of a *party* to arbitrate, as was the situation in *Warrior,* and the refusal of the arbitrator to arbitrate. Neither situation occurred in this case. It was the arbitrator's decision that was contracted for, and received by both parties here. There is no evidence that the arbitrator, NAC or the Pressmen appeared reluctant to arbitrate at any stage of the proceeding. Pursuant to the authority granted him in the collective bargaining agreement and the letter of submission, the arbitrator held a hearing, called all the witnesses proposed by each party, received all the evidence offered by each party and rendered a written decision denying the grievance. Under the Pressmen's theory of the case, any award denying a grievance could be considered a failure of the arbitrator to arbitrate. This court holds that the arbitrator did not refuse to arbitrate the dispute before him; he did arbitrate the grievance, and, on the basis of the contract language and the evidence presented to him, denied it. That is also precisely what he attempted to do again in the second decision and award.

Second, Pressmen argue that NAC did not object to the submission of further information requested by the arbitrator, thereby somehow waiving its right to complain about the reconsideration. In its letter of February 2, 1979, *supra,* NAC agreed to submit the supplemental information but it specifically did not agree that the arbitrator had jurisdiction to reconsider his award. NAC's letter does not rise to the level of either a waiver of its right to object to reconsideration or to a resubmission of the grievance to arbitration.

▐ Third, Pressmen attempt to persuade this court that the second decision and award was a clarification of the first award, or that the first award failed to resolve all matters submitted for arbitration. Clarification is a valid ground for reconsideration when the first decision, as written, is unenforceable, as in *Smith v. Hussmann Refrigerator Co.,* 442 F.Supp. 1144, (E.D. Mo. 1977), where the arbitrator's award could not be enforced because it designated six workers to fill four jobs. Likewise, in *Sharp v. Ryder Truck Lines, Inc.,* 465 F.Supp. 434, (E.D. Tenn. 1979), relied upon by Pressmen, the court had to decide which of several successive grievance committee decisions was binding, as they all could not be enforced. In *Sharp,* the several hearings did not offend the finality clause of the contract because all the hearings had been agreed to by the parties. *International Union of District 50, U.M.W.A. v. James Julian, Inc.,* 341 F.Supp. 503 (M.D. Pa. 1972), is also relied upon as authority for the arbitrator's rendering two conflicting decisions and awards. However, in *Julian* there were two hearings, and the court viewed the second hearing and award as an integral part of the first hearing. Further, in that case, the court found that both parties agreed to the reconsideration and second hearing, and that the arbitrator there was simply exercising the authority given him by the parties.

Last, the Pressmen contend that the first decision of the arbitrator was incomplete and so imperfect that it was not final because it was "made only with reference to the Collective Bargaining Agreement itself and not on *any* of the testimony." (emphasis added). This court has reviewed the transcript of the hearing stipulated as a part of the record here and finds that the parties had ample opportunity to present evidence, that the ending time of the Wednesday night shift was not at issue, and that testimonial evidence was introduced by *both* parties which substantiated the first award.

■ In reviewing the evidence presented in this motion, this court also determines that the arbitrator's first award was not arbitrary, capricious or discriminatory.

Defendant's motion for summary judgment is granted and plaintiff's motion for summary judgment is denied.

No attorneys fees are awarded. Costs to defendants.