COLONIAL PENN INSURANCE COMPANY

v.

The OMAHA INDEMNITY COMPANY, Mutual of Omaha Insurance Company, and Royal American Managers, Inc., The Omaha Indemnity Company, Appellant,

v.

NATIONAL RISK UNDERWRITERS, INC.

No. 90–1872.

United States Court of Appeals, Third Circuit.

Argued April 9, 1991.

Decided Sept. 5, 1991.

John W. Bonds, Jr. (argued), Francis M. Gregory, Jr., Frank J. Martin, Jr., Sutherland, Asbill & Brennan, Washington, D.C., William T. Hangley, Hangley Connolly Epstein Chicco Foxman & Ewing, Philadelphia, Pa., for appellant, The Omaha Indem. Co.

Patrick J. O'Connor (argued), Susan M. Danielski, Cozen and O'Connor, Philadelphia, Pa., for appellee.

Before SLOVITER, Chief Judge, and GREENBERG and WISDOM *, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Chief Judge.

After an arbitration panel issued a final award in favor of one of the parties, a majority of the panel issued a new award "clarifying" the original award and increasing the amount awarded. The district court granted the successful party's motion to confirm the second award, and denied the other party's motion to confirm the first award. This appeal presents the question whether the arbitrators exceeded their powers when they issued a second award, and, if so, the circumstances under which an arbitral award may be corrected because of an erroneous assumption of fact.

### I.

*Background Facts and Procedural History*

In October 1984, Colonial Penn Insurance Company entered into a reinsurance agreement, signed by Royal American Managers, Inc. (RAM) on behalf of Omaha Indemnity Company, pursuant to which Omaha (the reinsurer) was to indemnify Colonial Penn (the reinsured) against ninety percent

---

* Hon. John Minor Wisdom, Senior Circuit Judge of the United States Court of Appeals for the Fifth Circuit, sitting by designation.

of the losses Colonial Penn might experience on a book of short-term auto rental policies. Omaha apparently honored the agreement by accepting Colonial Penn's premiums and paying the agreed upon share of claims and expenses until September 1986 when it ceased funding the claims and asserted that RAM lacked authority to bind Omaha to the contract.

Colonial Penn filed this diversity action for breach of contract in the United States District Court for the Eastern District of Pennsylvania against Omaha, its parent Mutual of Omaha Insurance Company, and RAM. Omaha and Mutual of Omaha thereafter joined National Risk Underwriters, Inc. (NRU), Colonial Penn's underwriting manager, as a third-party defendant. Colonial Penn also asserted a claim against NRU for indemnification. In December 1987, the district court dismissed Omaha's claim against NRU, granted Omaha's motion to compel binding arbitration of its dispute with Colonial Penn as provided in the reinsurance agreement, and stayed the proceedings as to the parties other than Omaha and Colonial Penn.

A panel of three arbitrators was formed, whereby each party appointed an arbitrator and the two arbitrators together selected an umpire. Colonial Penn claimed that it had incurred losses and expenses of approximately $29 million as a result of Omaha's repudiation. In defense, Omaha contended, *inter alia,* that the parties had previously agreed to a rescission of the agreement pursuant to which Omaha had paid to Colonial Penn $9.6 million representing premiums that RAM had collected from Colonial Penn but failed to remit to Omaha. After the parties engaged in extensive discovery and briefing of legal and factual issues, they participated in an eight-day arbitration hearing.

The panel issued a unanimous "Final Award" on January 18, 1990, which provided in pertinent part:

1. When an insurer sets up a reserve, it designates part of its capital to fund policyholders' claims and makes these funds unavailable for other purposes. In addition to reserves set up for reported claims, actuaries estimate the

## FINAL AWARD

After due consideration of the extensive evidence introduced by the parties in this proceeding and careful examination of the briefs and arguments in support of their respective positions on each of the pertinent issues, the Panel unanimously finds, concludes and ORDERS that:

1. Omaha Indemnity shall pay the sum of $10 million to Colonial Penn without further delay in satisfaction of Omaha Indemnity's obligations to Colonial Penn under the Reinsurance Agreement between the parties dated October 1, 1984.

2. Omaha Indemnity Company *shall further release any and all claims to the reserves* (including IBNR) [1] *currently held by Colonial Penn to pay losses and loss adjustment expenses* arising out of the business which was the subject of the Reinsurance Agreement between the parties.

3. Upon payment of the sum of $10 million to Colonial Penn and release of all claims to such reserves, Omaha Ind[em]nity shall be relieved of any further liability for the payment of losses and loss adjustment expenses under the Reinsurance Agreement between the parties and also released from any other claims arising out of or related to the performance or nonperformance of its duties under that Agreement.

App. at 89–90 (emphasis added).

After reading the final award, Colonial Penn's counsel initiated a conference call to the umpire and Omaha's counsel. Colonial Penn's counsel stated that he was puzzled by the award because Colonial Penn was not holding any reserves on this program and that Omaha was not claiming any Colonial Penn reserves. During that conversation, the umpire stated that he thought, based on one of the exhibits presented at the arbitration, that Colonial Penn was holding reserves, including IBNR, of more than $8 million "and that it was the panel's

amounts that will be necessary to pay claims for losses that have been incurred but not yet reported. The reserves based on these actuarial estimates are characterized as Incurred But Not Reported (IBNR) reserves.

intention that Colonial Penn keep that amount and run off the business." Affidavit of Frank J. Martin, Jr., Omaha's counsel, App. at 117. The umpire stated that perhaps the matter should be clarified and, in response to the umpire's inquiry, counsel for Omaha responded that he thought the Final Award was clear and unambiguous. Omaha's counsel sent a letter to the arbitrators later that day stating, *inter alia,*

> I understand the Final Order ... to mean that, upon payment of the $10 million referred to in para. 1, Omaha Indemnity will have no further liability to Colonial Penn, and no claim against moneys held by Colonial Penn to fund the $8.9 million in reserves, whether by reason of the $9.6 million in "unused premium" previously paid by Omaha Indemnity to Colonial Penn, or otherwise.

App. at 120. Colonial Penn's counsel responded by letter requesting "an amended award which reflects the panel's understanding as to the amount it awarded Colonial Penn." App. at 123.

On January 29, 1990, Colonial Penn's arbitrator and the umpire, constituting a majority of the panel, issued a second (and substitute) order "[i]n response to a request from the parties for clarification ... and after review of the submissions of the parties in support of their joint request for clarification." App. at 64. The second order deleted the reference to any release by Omaha of a claim to Colonial Penn's reserves. Instead, it provided that in addition to the $10 million previously awarded to Colonial Penn, Omaha would also be required to pay to Colonial Penn "the sum of $8,988,783 which represents Omaha Indemnity's share of the reserves (including IBNR) which will be necessary to pay loss-

es and loss adjustment expenses arising out of the business which was the subject of the Reinsurance Agreement between the parties." [2]

In a letter accompanying this second award, the umpire explained that "at least a majority of the Panel was under the mistaken assumption that Colonial Penn was holding Omaha's 90% share of the reserves on the book of business in question and, therefore, that portion of the Award directing Omaha ... to release any and all claims to those reserves was designed to make that sum ($8,988,783) available to Colonial Penn for the purpose of paying claims in the run-off of the business." App. at 138. The third arbitrator dissented from this order.

On February 1, 1990, as directed in the first award, Omaha forwarded $10 million to Colonial Penn and stated in the covering letter that Omaha "hereby releases any and all claims to the reserves (including IBNR) currently held by Colonial Penn to pay losses and loss adjustment expenses arising out of the business which was the subject of the reinsurance agreement." App. at 141. On February 2, 1990, Colonial Penn filed a motion in the district court for an order confirming the second arbitration award and directing entry of judgment against Omaha. On February 16, 1990, Omaha moved to confirm the first arbitration award. The district court denied Omaha's motion, granted Colonial Penn's motion confirming the second arbitration award in the amount of $18,988,783, and ordered Omaha to pay the unpaid balance and post-judgment interest.

Omaha appealed but this court dismissed the appeal as premature because Colonial

---

**2.** The second arbitration order provided, in relevant part,

> 1. Omaha Indemnity shall pay the sum of $10 million to Colonial Penn without further delay in satisfaction of Omaha Indemnity's obligations to Colonial Penn under the Reinsurance Agreement between the parties dated October 1, 1984.
> 2. Omaha Indemnity Company shall also pay to Colonial Penn the sum of $8,988,783 which represents Omaha Indemnity's share of the reserves (including IBNR) which will be necessary to pay losses and loss adjustment ex-

> penses arising out of the business which was the subject of the Reinsurance Agreement between the parties.
> 3. Upon payment of the sum of $18,988,783 to Colonial Penn, Omaha Indemnity shall be relieved of any further liability for the payment of losses and loss adjustment expenses under the Reinsurance Agreement between the parties and also released from any other claims arising out of or related to the performance or nonperformance of its duties under that Agreement.

App. at 64–65.

Penn's claims against the other defendants were still pending. Thereafter, the district court entered a Rule 54(b) determination that there was no just reason to delay the entry of final judgment and a direction to enter his judgment as final. We have jurisdiction pursuant to 28 U.S.C. § 1291 (1988) to hear this appeal from the final order confirming the arbitration award. We apply a plenary standard of review. *Cf. Mutual Fire, Marine & Inland Ins. Co. v. Norad Reinsurance Co.*, 868 F.2d 52, 56 (3d Cir.1989) ("In reviewing the district court's denial of appellants['] motion to vacate the arbitration award, this Court will stand in the shoes of the district court and determine whether appellants were entitled to vacate the arbitration award pursuant to 9 U.S.C. § 10(d).").

## II.

### Discussion

#### A.

##### Waiver

■ Omaha contends on appeal that the district court erred in confirming the second arbitration award because the arbitration panel lacked the power to reexamine the merits of an announced final decision. However, we must consider initially Colonial Penn's contention that Omaha has waived its right to challenge the second award because it consented to the arbitration panel's reconsideration of its award by virtue of its participation in the clarification process by submitting correspondence to the panel and allegedly failing to challenge the panel's jurisdiction until the panel's second order was issued. The district court did not reach the waiver issue.

We reject Colonial Penn's claim that Omaha consented to be bound by any subsequent order of the panel. Although Omaha did participate in the conference call with the umpire as well as the various letters exchanged among the parties and the arbitrators, Omaha at all times took the

position that the first award needed no clarification and that Colonial Penn's request would, if granted, constitute more than the limited clarification that arbitrators are permitted to make on their own. Omaha may very well have believed, with some basis, that its failure to participate in these communications with the umpire and the panel would constitute a waiver of its subsequent right to challenge any possible change in the arbitration award. Omaha's behavior thus falls far short of constituting a consent to reconsideration of the award or a waiver of its jurisdictional challenge. We therefore consider the merits of Omaha's contentions.

#### B.

##### The Functus Officio *Doctrine*

■ As a general rule, once an arbitration panel renders a decision regarding the issues submitted, it becomes *functus officio*[3] and lacks any power to reexamine that decision. *See La Vale Plaza, Inc. v. R.S. Noonan, Inc.*, 378 F.2d 569, 572 (3d Cir. 1967); *United Mine Workers, Dist. 28 v. Island Creek Coal Co.*, 630 F.Supp. 1278, 1279 (W.D.Va.1986); *Salt Lake Pressmen, Local Union No. 28 v. Newspaper Agency Corp.*, 485 F.Supp. 511, 515 (D.Utah 1980); *Hartley v. Henderson*, 189 Pa. 277, 42 A. 198, 199 (1899). Despite certain distinctions between common law and statutory arbitrations, *see La Vale*, 378 F.2d at 571, the *functus officio* doctrine has been routinely applied in federal cases brought pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* (1988), *see Ottley v. Schwartzberg*, 819 F.2d 373, 376 (2d Cir. 1987); *American Centennial Ins. Co. v. Arion Ins. Co.*, No. 88 Civ. 1665, 1990 WL 52295 (S.D.N.Y. April 13, 1990) (LEXIS, Genfed library, Dist file).

■ The policy underlying this general rule is an "unwillingness to permit one who is not a judicial officer and who acts informally and sporadically, to re-examine a fi-

---

**3.** *Functus officio* derives from the Latin meaning "[a] task performed" and is defined by Black's as, "[h]aving fulfilled the function, discharged the office, or accomplished the pur-

pose, and therefore of no further force or authority." Black's Law Dictionary 606 (5th ed. 1979).

nal decision which he has already rendered, because of the potential evil of outside communication and unilateral influence which might affect a new conclusion." *La Vale*, 378 F.2d at 572; *McClatchy Newspapers v. Central Valley Typographical Union No. 46*, 686 F.2d 731, 734 (9th Cir.), cert. denied, 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982); *Washington–Baltimore Newspaper Guild, Local 35 v. Washington Post Co.*, 442 F.2d 1234, 1238–39 (D.C.Cir.1971); *see American Centennial Ins. Co. v. Arion Ins. Co.*, No. 88 Civ. 1665, 1990 WL 52295 (S.D.N.Y. April 18, 1990) (LEXIS, Genfed library, Dist file). Further, notwithstanding the fact that an increased utilization of arbitration in recent years has to some extent created the office of the specialized professional arbitrator, "[t]he continuity of judicial office and the tradition which surrounds judicial conduct is lacking in the isolated activity of an arbitrator." *La Vale*, 378 F.2d at 572; *McClatchy*, 686 F.2d at 734; *Washington–Baltimore Newspaper Guild*, 442 F.2d at 1239.

As we noted in *La Vale* and as recognized by the district court, the common law *functus officio* doctrine contains its own limitations. We described these as follows in *La Vale*: (1) an arbitrator "can correct a mistake which is apparent on the face of his award," 378 F.2d at 573; *see McClatchy*, 686 F.2d at 734 n. 1; (2) "where the award does not adjudicate an issue which has been submitted, then as to such issue the arbitrator has not exhausted his function and it remains open to him for subsequent determination," 378 F.2d at 573; and (3) "[w]here the award, although seemingly complete, leaves doubt whether the submission has been fully executed, an ambiguity arises which the arbitrator is entitled to clarify." *Id.*

Colonial Penn does not argue that either the second or third exception is applicable here. The award did not fail to adjudicate an issue submitted. The "ambiguity," if any, does not arise from doubt as to the full execution of the submission. However, Colonial Penn argued and the district court agreed that there was a mistake evident on the face of the first arbitration award because the panel ordered Omaha to release its claim to Colonial Penn's reserves when Colonial Penn was holding no reserves to which Omaha had any claim.[4] In a related vein, the district court also concluded that it was impossible to comply with the award because Omaha could not release any claims to reserves it was not holding.

We agree with Omaha that the district court's interpretation and application of the "mistake on the face of the award" standard cannot be sustained. The exception for mistakes apparent on the face of the award is applied to clerical mistakes or obvious errors in arithmetic computation. *See Local P–9, United Food & Commercial Workers v. George A. Hormel & Co.*, 776 F.2d 1393, 1394 (8th Cir.1985). Possibly, it could also be applied in a situation where the award on its face is contrary to a fact so well known as to be subject to judicial notice, but we take no position on that here.

In this case, it was not possible to tell from the face of the award either that Colonial Penn held no reserves to which Omaha might have a claim or that Omaha had not submitted a claim for any reserves allegedly held by Colonial Penn. The fact that there was a provision for release from claims does not on its face and without more suggest any mistake. In extending the limited exception for mistakes apparent on the face of the award to a situation where extraneous facts must be considered, the district court opened a Pandora's box which could subvert the policies on which the application of *functus officio* to arbitral decisions are predicated. Parties could, under the guise of a mistake in fact, seek recourse directly from the arbitrators in an attempt to overturn an adverse award. The need to regard arbitral awards

---

**4.** The district court opinion suggests that Colonial Penn was not holding any reserves. It stated, "how could Omaha Indemnity possibly release all claims it had to reserves held by Colonial Penn if Colonial Penn held no re-

serves?" Typescript Mem. Op. at 9, 1990 WL 61228. As Colonial Penn concedes, it did in fact hold reserves, but it had funded these reserves and there was no claim to them that Omaha could release.

as final and protect the arbitrators from outside influence is too strong to permit diminution of the *functus officio* doctrine.

Furthermore, in reaching its conclusion the district court considered the arbitrators' letter which repudiated part of the first arbitration award. It is generally improper for an arbitration panel to impeach its final award absent consent of the parties. *See Local P–9, United Food & Commercial Workers,* 776 F.2d at 1395; *McClatchy,* 686 F.2d at 733–34 & n. 1.[5] It would be equally improper for a court to base an exception to the *functus officio* doctrine on such an impeachment. It follows that the district court erred in concluding that the panel's second award was permissible under the "mistake on the face of the award" exception to the *functus officio* doctrine. It was therefore legal error for the court to confirm the second arbitration award, which was entered in derogation of the *functus officio* doctrine. *See Salt Lake Pressmen,* 485 F.Supp. at 515 ("When the arbitrator renders his final award, his power under the agreement is exhausted, and, unless his subsequent attempts to act under the agreement and submission fall within a few very narrow categories ..., they are null and void.").

### C.

### *Remand for Mistake*

It should be apparent that the policy reasons for the *functus officio* doctrine

precluding an arbitration panel from reconsidering its award are not applicable with the same force to action by the district court. In the first place, the court is not subject to the concerns about the arbitrator's lack of continuity and "isolated activity." *La Vale,* 378 F.2d at 572. Second, the court is not likely to be subject to the "evil of outside communication and unilateral influence." *Id.* Third, and most important, the court must necessarily exercise some review of the arbitral award when a motion to confirm is before it.

Of course, the scope of review of an arbitration award is very limited both at common law and under the Federal Arbitration Act.[6] That Act, however, does authorize the district court itself to modify or correct an award in certain limited situations which appear to some extent to be analogous to the exceptions to the *functus officio* doctrine.[7]

Because our reversal of the district court's order confirming the second arbitration award necessarily requires that it reconsider the motion to confirm the first arbitration award, the district court will need to know the parameters of its authority. It is generally recognized that there are circumstances, albeit limited, under which a district court can remand a case to the arbitrators for clarification. Although there is no explicit provision in the Act for

---

**5.** Although the second award states that there was a "joint request for clarification," App. at 64, there is no support in the record for that statement. Inasmuch as we have rejected Colonial Penn's waiver argument, we also reject its claim that this case falls within the additional exception for clarification of an award by the arbitrators upon the mutual assent of the parties. *See* Salt Lake Pressmen, 485 F.Supp. at 515–16.

**6.** Under the Federal Arbitration Act, a court may vacate the arbitrator's award:
   (a) Where the award was procured by corruption, fraud, or undue means.
   (b) Where there was evident partiality or corruption in the arbitrators, or either of them.
   (c) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by

which the rights of any party have been prejudiced.
   (d) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.
9 U.S.C. § 10 (1988).

**7.** The district court may modify or correct an award:
   (a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.
   (b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.
   (c) Where the award is imperfect in matter of form not affecting the merits of the controversy.
9 U.S.C. § 11 (1988).

such a remand, courts have uniformly stated that a remand to the arbitration panel is appropriate in cases where the award is ambiguous. *See, e.g., Mutual Fire, Marine & Inland Ins. Co.,* 868 F.2d at 58; *La Vale,* 378 F.2d at 573; *Americas Ins. Co. v. Seagull Compania Naviera, S.A.,* 774 F.2d 64, 67 (2d Cir.1985); *Island Creek Coal Sales Co. v. City of Gainesville,* 764 F.2d 437, 440 (6th Cir.), *cert. denied,* 474 U.S. 948, 106 S.Ct. 346, 88 L.Ed.2d 293 (1985).

Because of the limited purpose of such a remand, which serves the practical need for the district court to ascertain the intention of the arbitrators so that the award can be enforced, there is not even a theoretical inconsistency with the *functus officio* doctrine. *See Industrial Mut. Ass'n v. Amalgamated Workers, Local Union No. 383,* 725 F.2d 406, 412 n. 3 (6th Cir.1984) (despite *functus officio* rule, remand proper to clarify ambiguous award or to require arbitrator to address submitted but unresolved issue).

Moreover, we note that the Act itself provides for a remand to the arbitrators for purposes of rehearing in certain circumstances. *See* 9 U.S.C. § 10(e) (1988) ("Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrators.").

Of course, remand is to be used sparingly. Arbitrators are not as amenable to remand of a case for retrial in the same manner as are trial judges. *See Washington–Baltimore Newspaper Guild,* 442 F.2d at 1238–39; *see also Fischer v. CGA Computer Assocs.,* 612 F.Supp. 1038, 1041 (S.D.N.Y.1985) (danger that remand can frustrate basic purposes of arbitration because it delays execution of final judgment); *Ethyl Corp. v. United Steelworkers,* 768 F.2d 180, 188 (7th Cir.1985) (remand for clarification is disfavored procedure), *cert. denied,* 475 U.S. 1010, 106 S.Ct. 1184, 89 L.Ed.2d 300 (1986).

■ Because an arbitration award must be upheld even when there have been "errors ... in the determination of factual issues," *NF & M Corp. v. United Steelworkers,* 524 F.2d 756, 759 (3d Cir.1975), a remand that allows the arbitrators to reexamine their decision on the merits is not permissible. On the other hand, when the remedy awarded by the arbitrators is ambiguous, a remand for clarification of the intended meaning of an arbitration award is appropriate. As we said in *Mutual Fire,* "[a] district court itself should not clarify an ambiguous arbitration award but should remand it to the arbitration panel for clarification." 868 F.2d at 58. Such a remand avoids the court's misinterpretation of the award and is therefore more likely to give the parties the award for which they bargained. *See Galt v. Libbey–Owens–Ford Glass Co.,* 397 F.2d 439, 442 (7th Cir.) (remand sometimes appropriate to avoid judicial guessing of meaning of arbitral award; such remand does not constitute judicial invasion of arbitrators' province but rather gives parties clear decision from arbitrators that they bargained for), *cert. denied,* 393 U.S. 925, 89 S.Ct. 258, 21 L.Ed.2d 262 (1968); *Siegel v. Titan Indus. Corp.,* 779 F.2d 891, 894 (2d Cir.1985) (per curiam) (in order to ensure meaningful judicial review, courts on occasion may remand awards to arbitrators for clarification).

■ Unlike the exception to the *functus officio* doctrine which confines the arbitrators to correcting mistakes apparent on the face of the award, an ambiguity in the award for which the court may remand to the arbitrators may be shown not only from the face of the award but from an extraneous but objectively ascertainable fact. Thus, for example, if an arbitration award directed the transfer of real property, and the district court could ascertain that such property was no longer in the possession of the party directed to transfer it, the remedy would be unenforceable and hence ambiguous. This case may fall within the same category.

When Omaha moved to confirm the first arbitration award, Colonial Penn opposed that motion arguing, *inter alia,* that the panel's remedy reflected a mistaken belief as to the existence of reserves and IBNR which were the funds of Omaha. Colonial

Penn argued that the misdescription of the form of payment created an ambiguity or confusion because the method of payment described in the January 18, 1990 award was impossible of performance. The district court, which was under the mistaken impression of law that it could confirm the second arbitration award, never considered whether there was a sufficient ambiguity with respect to the remedy awarded in the first arbitration award to bring this situation within the limited circumstances warranting remand to the arbitrators.

The first arbitration award entered January 18, 1990 not only provides in paragraph 2 that Omaha "shall release any and all claims to the reserves (including IBNR) currently held by Colonial Penn arising out of the business between the parties," but provides in paragraph 3 that Omaha should provide "$10 million to Colonial Penn *and* release of all claims to such reserves" (emphasis added). This suggests that the award may have contemplated that Colonial Penn's compensation for the breach of contract by Omaha would be paid in two components, cash and release of a valuable monetary claim against it. If the district court can ascertain by clear and convincing evidence that Colonial Penn had no reserves to which Omaha made a claim, then the intent of the arbitrators as to the remedy would be ambiguous.

Under such circumstances, the district court would be authorized to remand so that the arbitrators themselves could clarify their intent as to the remedy awarded. Put differently, the arbitral award would be deemed unenforceable if part of the consideration awarded did not, in fact, exist. We are not persuaded by Omaha's argument that because it provided a release the award was enforceable. A release of a claim which never existed is worthless, just as a deed to property the signer does not own would be worthless. We do not discount the possibility that the arbitrators merely intended that Omaha pay $10 million and provide a form release, even if Omaha had no claim to the reserve. That is, however, the essence of the ambiguity.

We caution that we are not suggesting that the district court should order a remand in this case but merely instruct that such a remand is within its power upon a finding of ambiguity. If the same arbitrators are unavailable, then the district court would be authorized to convene a new arbitration panel for the limited purpose of clarifying the ambiguity in the remedy provided in the first arbitration award.

### III.

### *Conclusion*

For the reasons set forth above, we will reverse the district court's order granting Colonial Penn's motion to confirm the second arbitration award. We will vacate the district court's order denying Omaha's motion to confirm the first arbitration award and will remand to the district court for further proceedings consistent with this opinion. Each party to bear its own costs.