**SAXIS STEAMSHIP CO., Owners of the SS WARM SPRINGS, Petitioner-Appellee,**

v.

**MULTIFACS INTERNATIONAL TRADERS, INC., Respondent-Appellant,**

v.

**AMERICAN RENAISSANCE LINES, INC., Petitioner-Intervenor-Appellant.**

**No. 329, Docket 30938.**

United States Court of Appeals Second Circuit.

Argued Feb. 9, 1967.

Decided March 30, 1967.

Harry T. Constas, Jamaica, N. Y., for respondent-appellant.

Francis J. O'Brien, New York City (Zock, Petrie, Sheneman & Reid, New York City, on the brief), for petitioner-appellee.

James M. Leonard, New York City (McHugh & Leonard, New York City, on the brief), for petitioner-intervenor-appellant.

Before LUMBARD, Chief Judge, and SMITH and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

On September 20, 1965, the appellant chartered the vessel SS Warm Springs from its owner, the appellee Saxis Steamship Co., for the purpose of carrying cargoes to South Vietnam. The form of charter party was one generally known in the shipping business as the New York Produce Exchange Time Charter, which provided, *inter alia:*

"That should any dispute arise between the owners and charterers, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men."

The owner and charterer agreed that the vessel would be delivered at the Island of Taiwan for its use over a period of from three to five months, at the option of the charterer, in carrying cargo between Taiwan and various ports of South Vietnam. The charter hire was $72,000 per month, plus war risk insurance and crew area bonus,[1] which came to an additional cost to the charterer of approximately $3,500 per day.

Multifacs acting by its president, Mary Owens, wrote a letter on September 23, 1965 to American Renaissance Lines, Inc., an incipient corporation which actually did not come into being until it was incorporated under the laws of the State of New York five days later, which read as follows:

"Dear Sirs:

We confirm our agreement wherein Multifacs International Traders, Inc., assigns the Charter Party dated September 20, 1965 between Multifacs International Traders, Inc., as Charterers, and Owners Saxis Steamship Company, and Columbia Steamship Co., Inc., as agents for Owners to American Renaissance Lines, Inc., for the consideration

---

1. Since the vessel was to operate in a War Zone, the crew was entitled to a bonus equal to 100% of its normal wages.

of $1.00 and other considerations duly acknowledged between the parties.

This agreement is to take effect as of 12 Noon today."

The relationship between Multifacs and Renaissance, as far as the record is concerned, remains obscure. The trial judge commented that the failure to clarify it "signified complexities of arrangement that the parties elected not to disclose." Mary Owens appears to have been a shareholder and president of both corporations and one James Georgelis was vice-president of both. The bills of lading for cargo carried on the Warm Springs were issued in the name of Renaissance; and, although on some occasions the name of Multifacs was used in transactions relating to the Warm Springs, in general the name used was that of American Renaissance Lines, Inc.

The vessel was delivered by the owners at the port of Kaohsiung, Taiwan, as agreed, on September 27, 1965, and the captain received his orders for the first voyage to Saigon, which was completed without incident. The events occurring during the second voyage, however, gave rise to the controversy with which the present case is concerned.

The Warm Springs was loaded for the second voyage at Taiwan with a cargo consisting of 2,600 tons of cement, consigned to the United States Overseas Mission at Danang, South Vietnam, 2,560 tons of general cargo for various consignees at Danang, and a general cargo of about 4,195 tons, consigned to various persons at Saigon. The vessel arrived at Danang on December 7, 1965, where cargo had to be lightered because there was not sufficient depth to the harbor to permit the Warm Springs to go alongside of the pier. Under the bills of lading, consignees were required to provide the lighters, which were available there for hire. The United States Overseas Mission accordingly hired and sent out lighters, by means of which the entire cargo of cement was discharged by December 21, 1965.

The consignees of general cargo, however, despite the fact that lighters were available, refused to send any out. They adopted this course because they were thus able to "warehouse" their goods, safe from the pilferage which then accompanied wartime conditions ashore. Moreover, the evidence before the arbitrators showed that the consignees were also enabled thereby to profit from the rapidly growing inflation in South Vietnam by holding the goods temporarily off the market.

This refusal to provide prompt lighterage was in contravention of the express terms of the bill of lading and made the shipper, consignee and the goods themselves liable for and subject to lien for all loss, expense and damage suffered by the carrier from the resulting detention of the ship and cargo. The delay was expensive for the carrier for it not only suffered the loss of the use of the ship for which it was paying charter hire but it was also required to pay the $3,500 for war risk insurance and crew bonus for each of the idle days.

In an attempt to prevent further such losses Renaissance, several times between January 10 and 28, 1966, ordered the captain of the vessel to depart from Danang and return to Taiwan. It was Renaissance's intention to transfer the Danang general cargo at Taiwan, to a shoal draft vessel which could dock at Danang and unload. Meanwhile, the Warm Springs would fill the vacated space with cement, consigned to the United States Overseas Mission at Saigon, to be delivered there together with the general cargo already on board. The captain under orders issued by the owner, which he represented, refused, for reasons irrelevant to this appeal, to obey the charterer's direction to deviate from the original voyage plan and kept the Warm Springs at Danang until February 2, 1966, when it finally discharged the last of the general cargo consigned to that port. On the same day it left Danang and proceeded, pursuant to the original plan of the voyage, to Saigon. The vessel was not fully unloaded until March 27, 1966, when the time charter terminated. The charterer, who had paid Saxis in

advance for hire to January 27, 1966, stopped all payments as of that date. Consequently Saxis claimed $300,795.64 from Multifacs for the non-payment of hire, war risk insurance and crew area bonus for the period from January 27, 1966 to March 27, 1966 and demanded arbitration in accordance with the terms of the charter party.

Multifacs, however, in addition to contesting its liability to Saxis, claimed damages of $268,966.42, which it alleged were caused by the owner in refusing to obey the direction to leave Danang on January 12, 1966. The arbitrators unanimously agreed that the owner had breached the charter party by defying the charterer's instructions but they decided that the breach was not of such magnitude as to entitle the charterer to withhold payment of hire while the cargo was still on board ship. A majority of the arbitrators, however, also ruled that, although it was established that damages of at least $144,439 were caused by the owner's breach,[2] Multifacs could not recover from Saxis.

Their *ratio decidendi* was that Renaissance, which they described as Multifacs' subcharterer, was the only party who had been injured by the breach. As Renaissance had not successfully asserted any of its damages against Multifacs,[3] the latter could not establish any injury which resulted to it because of the breach by Saxis. The arbitrators thus denied Multifacs the right to set off against the amount awarded to Saxis[4] the damages caused by the owner's breach.

■ As the charterer stipulated in the charter party that any disputes were to be submitted to arbitration for decision, it is bound by that agreement. See, e. g., In the Matter of Marcy Lee Mfg. Co. and Cortley Fabrics Co., 354 F.2d 42 (2 Cir. 1965). In such cases the role of the courts is limited to ascertaining whether there exists one of the specific grounds for the vacation of an award, provided in § 10 of the Arbitration Act, 43 Stat. 883 (1925), as reenacted, 61 Stat. 669 (1947), 9 U.S.C. § 10 (1959).[5] We have made it quite clear on earlier

2. The damages found were (1) a lost profit of $28,939, which would have been earned if the charterer had been able to pick up the cement at Taiwan and deliver it to Saigon, (2) $45,500 in reduction of hire payments to the owner based on the finding that, if the captain had followed instructions, the charter would have ended on March 14, 1966 with the unloading of all goods, rather than on March 27, (3) demurrage of $70,000 which the United States would have paid for the time that the Warm Springs spent in Saigon Harbor unloading and waiting to unload cement, a priority cargo for which it paid demurrage.

3. American Renaissance did claim demurrage against Multifacs, but, despite invitations by the arbitrators to prove that it had been successfully asserted, Multifacs failed to establish that any money was recovered from it.

4. The original award was $265,795.64, less $5171.20 for payments by Multifacs to Saigon agents, which was the only claim it was permitted to set off. The arbitrators made a mistake in computation of war risk insurance and crew area bonuses, however, and were properly permitted by the district court to revise their computation for that amount upward from $107,-

541.20 to $132,356.07, making a total award of $290,611.51, less $5151.20.

5. "In either of the following cases the United States court * * * may make an order vacating the award upon the application of any party to the arbitration—

    (a) Where the award was procured by corruption, fraud, or undue means.

    (b) Where there was evident partiality or corruption in the arbitrators, or either of them.

    (c) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

    (d) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

    (e) Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrators."

occasions that it is the function neither of this court nor of the district courts to review the record of the arbitration proceeding for errors of law or fact.[6] See, e. g., Southeast Atlantic Shipping Ltd. v. Garnac Grain Co., 356 F.2d 189 (2 Cir. 1966); Orion Shipping and Trading Co. v. Eastern States Petroleum Corp., 312 F.2d 299 (2 Cir. 1963); Amicizia Societa Navegazione v. Chilean Nitrate & Iodine Sales Corp., 274 F.2d 805, 808 (2 Cir. 1960); James Richardson & Sons, Ltd. v. W. E. Hedger Transport Corp., 98 F.2d 55 (2 Cir. 1938), cert. denied 305 U.S. 657, 59 S.Ct. 357, 83 L.Ed. 426 (1939); North of England SS Co. Ltd. v. Munson SS. Line, 62 F.2d 72 (2 Cir. 1932), cert. denied 288 U.S. 601, 53 S.Ct. 320, 77 L.Ed. 977 (1933). Cf. Wilko v. Swan, 346 U.S. 427, 436–437, 74 S.Ct. 182, 98 L.Ed. 168 (1953); San Martine Compania de Navegacion v. Saguenay Terminals Ltd., 293 F.2d 796, 801 (9 Cir. 1961). It is true that when a claim of partiality is made, the court is under an obligation to scan the record to see if it demonstrates "evident partiality" on the part of the arbitrators. See Ballantine Books, Inc. v. Capital Distributing Co., 302 F.2d 17 (2 Cir. 1962). The burden of proof on this issue in the confirmation proceedings in the district court rests upon the party making the claim. The trial court was justified in holding that Multifacs failed to meet that burden in this case. See Stef Shipping Corp. v. Norris Grain Co., 209 F.Supp. 249, 253 (S.D.N.Y.1962); In the Matter of Ilios Shipping and Trading Corp. v. American A. & B. Coal Corp., 148 F.Supp. 698 (S.D. N.Y.), affirmed, 245 F.2d 873 (2 Cir. 1957). In addition to the specific proscriptions of 9 U.S.C. § 10, the Supreme Court has held in Wilko v. Swan, supra, 346 U.S. 436, 440, 74 S.Ct. 182, that an award, based on "manifest disregard" of the law, will not be enforced; but this presupposes "something beyond and different from a mere error in the law or failure on the part of the arbitrators to understand or apply the law." San Martine Compania de Navegacion v. Saguenay Terminals Ltd., supra, 293 F.2d at 801. See also Amicizia Societa Navegazione v. Chilean Nitrate & Iodine Sales Corp., supra, 274 F.2d at 808. Any such exception must be severely limited, because extensive judicial review frustrates the basic purpose of arbitration, which is to dispose of disputes quickly and avoid the expense and delay of extended court proceedings. See, e. g., Chatham Shipping Co. v. Fertex SS. Corp., 352 F.2d 291, 294 (2 Cir. 1965); Amicizia Societa Navegazione v. Chilean Nitrate & Iodine Sales Corp., supra; Note, Judicial Review of Arbitration Awards on the Merits, 63 Harv.L.Rev. 681 (1950).

In the present case the arbitrators reached the result they did by first concluding that Renaissance was a subcharterer or sublessee. Multifacs so designated Renaissance throughout the arbitration proceedings, and, if that is correct, then under the attendant circumstances the award to Saxis logically followed.[7] But even if the arbitrators misdescribed and misconceived the relationship, and the letter of September 23, 1965 actually made an assignment to Renaissance, as Multifacs now so strongly urges,

---

6. In Southeast Atlantic Shipping Ltd. v. Garnac Grain Co., supra, this court made it clear that, because there is often no merit in appeals from the confirmation of an award, consideration will be given to granting to the appellee a penalty award of 10% of the judgment pursuant to our Rule 26(b), if the appeal is taken for delay. Application for the penalty was made here, but, because of the involvement of the claims by Renaissance, we are of the opinion it is not a case for the application of Rule 26(b).

7. The subcharter relationship normally gives the subcharterer no rights against the general owner of a vessel, see Perez v. Cia Tropical Exportadora, 182 F.2d 874, 875 (5 Cir. 1950); Flat-Top Fuel Co. Inc. v. Martin, 85 F.2d 39, 41 (2 Cir. 1936). That being so, the only rights Multifacs could assert would be its own. To recover in this case by way of counterclaim for breach of contract, Multifacs must show that it had paid damages or had become liable for them—a fact which it failed to prove.

still the damages could not be set off by Multifacs against Saxis' award.[8]

▮▮▮▮▮ Following Saxis' motion to confirm the award, Renaissance moved to intervene on the theory that, since the arbitrators had concluded that it was injured in the sum of at least $144,439, it was entitled to recover against Saxis in the arbitration proceedings. The district judge correctly denied the motion. He also concluded, however, that whatever rights Renaissance may have had against Saxis were lost as a result of Rennaissance's apparently close identification with Multifacs and its partial participation in the Multifacs-Saxis arbitration, even though Renaissance was not a party. We are of the opinion that the district court was in error in so doing. While we voice no opinion on the merits of the substantive issues involved, i. e., whether Renaissance was a subcharterer or an assignee, we believe that it was improper for the district judge to resolve that issue against Renaissance in reliance upon proceedings to which Renaissance was not a party [9] and concerning matters on which Renaissance had never had an opportunity to be heard. Flanzbaum v. M & M Transport Co., 286 F.2d 500, 503 (2 Cir. 1961); Orion Shipping & Trading Co. v. Eastern States Petroleum Corp., supra, 312 F.2d at 301.

Renaissance should not have been barred by the district court from bringing an action against Saxis in an effort to recover damages from it. In such an action Saxis would undoubtedly raise the issues of *res adjudicata* or collateral estoppel on which evidence could be offered by the parties; and, if it were determined that Renaissance had not been foreclosed by the terms of the arbitration award, then the substantive issues of whether Renaissance was a subcharterer or an assignee could, after hearing thereon, be adjudicated. Nothing in this opinion or in that of the district court, however, should be taken or construed as affecting or predetermining the issues involved in such an action.

That portion of the District Court's order which confirmed the award is affirmed, but the portion which bars further action by Renaissance against Saxis is reversed.

---

8. At best the "assignment" of the charter party to Renaissance made Multifacs a mere surety for the performance by Renaissance of its obligations to Saxis. The general rule is that, absent insolvency on the part of the principal, the surety cannot set-off claims of its principal in an action brought against it by the creditor. See, United States ex rel. Johnson v. Morley Const. Co., 98 F.2d 781, 789 (2 Cir. 1938); Clark Car Co. v. Clark, 48 F.2d 169, 170 (3 Cir. 1931); Atlantic Coast Line R. Co. v. United States Fidelity & Guaranty Co. Inc., 52 F.Supp. 177, 188 (M.D.Ga.1943); Tidewater Coal Exch., Inc. v. New Amsterdam Casualty Co., 20 F.2d 951, 954 (D.Del.1927); 4 Williston, Contracts § 1251 (2d ed. 1936 and supplement). But cf. Meeker v. Halsey, 87 F.2d 299, 301 (2 Cir. 1937) (surety may set-off claims of the principal if principal has demonstrated clear intent to sue the creditor). This is to be distinguished from the cases, on which the appellant erroneously relies, where certain defenses of the principal may be used by the surety, as Williston, supra, makes clear.

9. The district judge ruled that "Renaissance was so far involved with Multifacs in the arbitration that it is concluded by the result * * *" The decision was based on the fact that Renaissance was "present" through its common officers, its counsel and its Taiwan agent and, despite invitations by the arbitrators, made no attempt to clear up the ambiguity about its status or to become a party to the arbitration.