**LAURIN TANKERS AMERICA, INC., Petitioner,**

v.

**STOLT TANKERS, INC., Respondent.**

No. 98 CIV. 6584(CSH).

United States District Court,
S.D. New York.

March 1, 1999.

Nourse & Bowles, LLP, New York, NY (David A. Nourse, Rahul Wanchoo, of counsel), for Petitioner.

Carter, Ledyard & Milburn, New York, NY (Mark C. Flavin, of counsel), for Respondent.

**MEMORANDUM OPINION AND ORDER**

HAIGHT, Senior District Judge.

This case requires the Court to consider whether the Federal Arbitration Act allows a district court or commercial arbitrators to correct an arbitration award based in part upon a mathematical calculation which the arbitrators subsequently acknowledge to be erroneous. The question arises on a petition to modify and correct the award, or alternatively to remand the matter to the arbitrators for further proceedings.

**I**

Petitioner Laurin Tankers America, Inc. ("Laurin") chartered the M/T MOUNTAIN BLOSSOM to respondent Stolt Tankers, Inc. ("Stolt") to carry quantities of two chemicals, monoethylene glycol ("MEG") and diethylene glycol ("DEG"), from U.S. Gulf ports to Mediterranean ports. The charterparty contained an agreement for the arbitration of disputes in the City of New York before a panel of three arbitrators.

The MOUNTAIN BLOSSOM is a "parcel tanker." The more conventional vessel's cargo-carrying tanks are filled with the same substance for carriage from one port to another. The parcel tanker, divided into a number of smaller tanks, is capable of loading, carrying, and discharging different substances (or "parcels") at different ports on the same voyage.

On February 21, 1995 the MOUNTAIN BLOSSOM arrived at the port of New Orleans to load the Stolt parcels. The designated discharge ports were Torre Annunziata, Italy (south of Naples), and Ravenna, Italy. But the cargoes were not loaded into the vessel. On March 10, 1995, Stolt advised Laurin that it had rejected the vessel, and further advised that Laurin was free to proceed on the voyage and seek alternative employment.

On March 13 the MOUNTAIN BLOSSOM sailed from New Orleans to St. Croix, where she loaded a parcel of xylene for discharge at Priolo, Italy pursuant to a previously existing charterparty between Laurin and Enichem Americas, Inc. ("Enichem"). That is to say, Laurin had entered into its charterparty with

Enichem before Stolt rejected the MOUNTAIN BLOSSOM under the charterparty between Laurin and Stolt. The Enichem charterparty was not substitute business arranged by Laurin after Stolt's rejection of the vessel. Had Stolt performed its charterparty with Laurin, the MOUNTAIN BLOSSOM would have loaded Stolt's two parcels at New Orleans, sailed to St. Croix and loaded the Enichem parcel, sailed trans-Atlantic to Priolo and discharged the Enichem parcel, and then sailed to Torre Annunziata to discharge one Stolt parcel and to Ravenna to discharge the other.

Laurin demanded arbitration of its claim that Stolt breached the charterparty by rejecting the vessel at New Orleans. A panel of three experienced maritime arbitrators was appointed: Manfred W. Arnold, Klaus C.J. Mordhorst, and Patrick V. Martin as chairman. After the panel conducted two evidentiary hearings, but before making an award, Stolt conceded liability for wrongful rejection of the vessel and cancellation of the charterparty voyage. That left the arbitrators to decide the amount of Laurin's damages.

## II

The arbitrators did so in a unanimous award dated June 19, 1998. They found that had Stolt performed the charter, Laurin would have earned gross freights of $594,526.50. But the proper calculation of damages caused by cancellation of the Stolt char-

ter was affected, in the arbitrators' view, by the performance of the Enichem charter, which partially overlapped in time and space with the originally intended Stolt charter. The arbitrators explained their approach as follows:

> From the freight for the notional voyage, i.e., the one that should have been performed, the Owner [Laurin] must give credit in its calculations for the expenses not incurred in the performance of that notional voyage. These include: (1) the fuel consumption from New Orleans to St. Croix, (2) fuel consumed from St. Croix to Priolo, on a pro-rata basis with two-thirds being assessed against the Stolt charter and (3) fuel savings for the voyage from Priolo to Torre Annunziata and Ravena [sic].

Award at pp. 4–5. In a footnote, the arbitrators explained that the two-thirds pro-rating of fuel on the St. Croix/Priolo leg of the voyage, in performance of the Enichem charter, "is based upon the fact that the voyage must be viewed as a total concept," and, thus viewed, "Stolt's cargo represented approximately two-thirds of the total intended cargo and likewise approximately two-thirds of the voyage revenue." *Id.* at p. 5 n. 1.

The arbitrators undertook to implement this approach by calculating the amounts of fuel oil the MOUNTAIN BLOSSOM consumed while at sea during these three passages. I reproduce the arbitrators' calculations, which appear in their award at p. 6:

Bunkers Nola/St. Croix
  5.1 days × 51.7T × $100)   (29,986.00)
  5.1 days × 4.7 × $151)

Bunkers Priolo/Torre Annunziata–Ravena
  3.1 days × 51.7T × $100)   (16,027.00)
  3.1 days × 4.7 × $151)   ( 2,200.07)

Torre Annunziata–Ravena disbursements   (55,485.00)

St. Croix/Priolo
  15.3 days × 51.7T × $100   =   $79,101
  15.3 days × 4.7 × $151   =   10,858
  2/3 against Stolt voyage   (59,973.00)

The deductions from damages for fuel consumption "not incurred in the performance" of the "notional" Stolt charter total $108,186.54, comprised of three amounts: $29,-

986.47 for fuel consumed during the New Orleans/St. Croix passage, fully charged against damages because the MOUNT BLOSSOM sailed to St. Croix solely for the purpose of loading the Enichem cargo; $59,973.00 for fuel consumed during the St. Croix/Priolo passage, pro-rated two-thirds against damages on the basis previously noted; and $18,277.07 for the Priolo/Torre Annunziata/Ravenna passages, fully charged against damages because the cancellation of the Stolt charterparty relieved the vessel of the necessity of making these passages.[1]

The arbitrators' calculations of fuel consumption savings appearing on p. 6 of the award employ a form of shorthand, but the meanings appear from the evidence before them, as summarized by Laurin in its present petition, and are not disputed. The notation "51.7T × $100" means 51.7 tons of fuel oil at a cost of $100 per metric ton, which equals $5,170. The notation "4.7 × $151" means 4.7 tons of diesel oil at a cost of $151 per metric ton, which equals $709.70.[2] The arbitrators then multiplied those amounts by the number of days the MOUNTAIN BLOSSOM was at sea on each passage. It necessarily follows that the arbitrators regarded these amounts of fuel as the vessel's *daily rates of consumption.*

We now arrive at the basis for Laurin's petition to the Court. The exhibits and briefs of counsel submitted to the arbitrators, reproduced on this petition, seem to establish beyond question or dispute that the consumption figures of 51.7 tons of fuel oil and 4.7 tons of diesel oil represent *not* daily consumption, but rather the vessel's total consumptions during the sea passage from Priolo to Torre Annunziata and then on to Ravenna.

Presumably in preparation for the arbitration, on November 5, 1996 Laurin's agent telexed to the master of the MOUNTAIN BLOSSOM a request for "some est [estimated] consumptions," namely: "The voy would of [*sic*] been Priolo to Naples then onto Ravenna. I need est consumptions for the above sea passage (abt 3.10 days)."[3] The master telexed back: "Passage consumption HFO/MDO 51.7/4.7 mt." That is a shorthand way of saying that on that sea passage taking 3.1 days, the vessel would have consumed an estimated 51.7 metric tons of heavy fuel oil ("HDO") and an estimated 4.7 metric tons of marine diesel oil ("MDO"). Laurin submitted copies of these telexes to the arbitrators as exhibits.

At the arbitration, Stolt accepted those figures and argued from them. In its main brief to the arbitrators at pp. 11–12, Stolt referred to the "daily bunker consumption of the vessel"[4] at sea as "IFO 16.7" and "MDO 1.5."[5] The basis for Stolt's calculations of daily consumption is not shrouded in mystery; it may be divined without going to Delphos and sacrificing a sacred dove. Stolt simply adopted the Priolo/Torre Annunziata/Ravenna sea passage consumption estimates contained in Laurin's exhibits. 51.7 tons of fuel oil divided by 3.1 days yields a daily consumption of 16.7 tons. 4.7 tons of diesel oil divided by 3.1 days yields a daily consumption of 1.5 tons. QED.

In these circumstances, and with all due respect to a distinguished panel, it seems beyond cavil that in their calculations, the

1. The calculations from the award that I have reproduced in text include a $55,485.00 deduction from damages for disbursements at Torre Annunziata and Ravenna which Laurin itself credited, and is not at issue on this petition. In their calculations on p. 6 of the award, the arbitrators rounded down the fuel on the New Orleans/St. Croix passage from $29,986.47, the figure they recite on p. 5, to $29,986.00. The word "Nola," as used in the calculations, is the shipping industry's abbreviation for New Orleans.

2. A vessel underway consumes fuel oil to drive her main engines, and diesel oil to run her auxiliary machinery.

3. Laurin had to appeal to the MOUNTAIN BLOSSOM's master for assistance in developing this information because Laurin did not own the vessel. Rather, Laurin time-chartered the vessel from her owners. The charter between Laurin and Stolt was a sub-charter.

4. "Bunker" or "bunkers" (the word used in the award's calculations) is maritime parlance for fuel oil.

5. "IFO" means intermediate fuel oil. Laurin's exhibits referred to "HFO," or heavy fuel oil. The difference is not material in the present context.

arbitrators mistakenly factored in the vessel's *sea passage* fuel consumption as *daily* fuel consumption. Given the arbitrators' method of measuring the economic impact of the Enichem charter upon Laurin's claim (which Laurin does not challenge), the effect of the arbitrators' error was to exaggerate the deductions from Laurin's recoverable damages on the Stolt charter, thereby improperly reducing the award to Laurin.

### III

Following receipt of the award, Laurin's counsel wrote to the arbitrators, pointed out the apparent error discussed under Point II, and asked that the award be modified "by insertion of 16.7 MT in place of 51.7 MT as the vessel's daily consumption of IFO and 1.5 MT in place of 4.7 MT as the vessel's daily consumption of MDO." Letter dated July 9, 1998 at 5. Counsel for Laurin calculated that those modifications would increase the award in Laurin's favor (after recalculation of interest) from $429,935.36 to $522,920.78.[6] Counsel for Stolt, while not agreeing with or contesting Laurin's figures or its claim that the arbitrators had fallen into error, simply responded that the award, once rendered, was final, and that "[t]he doctrine of *functus officio* precludes the Panel from selectively re-examining parts of the award, so that it may be more to [Laurin's] liking."[7] Letter dated July 16, 1998. Counsel for Laurin pressed its request for a modification of the award in a letter to the arbitrators dated July 20, 1998.

The arbitrators responded in a letter dated August 17, 1998 signed by chairman Martin with the authority of arbitrators Arnold and Mordhurst. That letter reads in its entirety:

> The Panel has reviewed the exchange of correspondence ending with Nourse & Bowles letter of July 20, 1995. Laurin has requested that the Panel modify its Award of June 19, 1998, on the basis that there was an error in calculating the bunker consumption of the vessel. Stolt argues

that the Panel is *functus officio* and has no power to modify the Award. In response, Laurin states that the Panel should merely correct its calculation.

> The figure of 51.4mt used by the Panel appears to be erroneous. However, what should be the correct figure is not obvious or apparent based on the evidence submitted during the hearings.

> The Panel will not make any modifications of the Award unless jointly requested by the parties to do so, or, there is a court order stating that the Panel may reopen the Award and make further findings.

In point of fact, the "51.4mt" amount referred to in chairman Martin's letter is in itself erroneous. As we have seen, the arbitrators based their calculations on a purported daily fuel oil consumption of *51.7* metric tons. But this second discrepancy does not affect the resolution of the petition.

Following receipt of the Martin letter, Laurin filed this petition under the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.*

### IV

Subject matter jurisdiction over Laurin's petition is present because the arbitration agreement forms part of a maritime contract of charterparty. *See* FAA, 9 U.S.C. §§ 1, 2. Venue is proper because the award was made in this district.

Laurin relies primarily upon § 11(a). Section 11 provides in its entirety:

> In either of the following cases the United States court in and for the district wherein the award was made may make an order modifying or correcting the award upon the application of any party to the arbitration-

> (a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any

---

**6.** The arbitrators also awarded Laurin $60,000 as an allowance toward its legal fees and expenses, an award not implicated by the present petition.

**7.** "[O]nce arbitrators have finally decided the submitted issues, they are, in common law parlance, '*functus officio*,' meaning that their authority over those questions is ended." *Trade & Transport, Inc., v. Natural Petroleum Charterers, Inc.,* 931 F.2d 191, 195 (2d Cir.1991).

person, thing, or property referred to in the award.

(b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.

(c) Where the award is imperfect in matter of form not affecting the merits of the controversy.

The order may modify and correct the award, so as to effect the intent thereof and promote justice between the parties.

Laurin contends that this case falls squarely within the wording of § 11(a). In Laurin's view, the arbitrators made "an evident material miscalculation of figures" with respect to the MOUNTAIN BLOSSOM's fuel consumption, thereby reducing the award to Laurin, and entitling Laurin to an order of this Court "modifying or correcting the award . . ., so as to effect the intent thereof and promote justice between the parties." The order that Laurin asks the Court to enter would adopt the dollar increase in the award that it asked the arbitrators to make in the post-award correspondence. In the alternative, Laurin asks the Court to remand the case to the arbitrators for further proceedings to correct their error.

Stolt nowhere challenges Laurin's contention that the arbitrators made the miscalculation Laurin describes. Instead, Stolt argues that Laurin is not entitled to either form of alternative relief, for several reasons: first, the grounds for judicial review of arbitration awards are limited, and none applies here; second, § 11(a) as interpreted by case law requires that the arbitrators' miscalculation or mistake appear "on the face of the award," and none appears here; third, a remand to arbitrators is appropriate only to correct an ambiguity in the award, and none appears here; and fourth, the arbitrators lack authority to redetermine Laurin's damages, since the making of a final award rendered them *functus officio.*

The briefs of counsel cite cases in support of these various propositions. I will discuss

some of them. But the parties do not cite the case which seems to me the most instructive, given the facts of the case at bar.

That case is *Saxis Steamship Co. v. Multifacs International Traders, Inc.,* 375 F.2d 577 (2d Cir.1967). Disputes arising out of a time charterparty calling for voyages to South Vietnamese ports were submitted to arbitration. The charterer stopped making hire payments to the owner, under circumstances which I need not recount. In consequence, "Saxis [the owner] claimed $300,-795.64 from Multifacs [the charterer] for the non-payment of hire, war risk insurance and crew area bonus for the period from January 27, 1966 to March 27, 1966 and demanded arbitration in accordance with the terms of the charter party." 375 F.2d at 581. Under the contract, the cost of war risk insurance and crew area bonuses were to be paid by the charterer.

After the arbitrators made their award, the district court confirmed it and the Second Circuit affirmed.[8] The court of appeals' decision contains this footnote, which can only be characterized as intriguing in the context of the present case:

> The original award was $265,795.64, less $5,171.20 for payments by Multifacs to Saigon agents, which was the only claim it was permitted to set off. The arbitrators made a mistake in computation of war risk insurance and crew area bonuses, however, and were properly permitted by the district court to revise their computation for that amount upward from $107,541.20 to $132,356.07, making a total award of $290,-611.51, less $5,151.20.

375 F.2d at 581 n. 4.

The district court's opinion in *Saxis* was not officially reported, and of course the arbitrators' award cannot be found in those austere West Publishing Company volumes. But that indispensable resource, *American Maritime Cases,* allows a complete understanding of the case, for both the award, 1967 A.M.C. 140, and the district court opinion, 1967 A.M.C. 129 (E.D.N.Y.1966) (Dooling, J.), are printed in full.

8. The court of appeals reversed the district court on another ground not relevant to the case at bar.

From those documents, the careful reader learns that on June 8, 1966, the arbitrators issued an award in favor of Saxis and against Multifacs. On June 23, 1966, the arbitrators issued an "addendum to the award" (to use the arbitrators' phrase, 1967 A.M.C. at 146 n. *) or a "Supplemental Award" (to use the district court's phrase, 1967 A.M.C. at 133). We know both dates because Judge Dooling began his opinion for the district court with the sentence: "Saxis Steamship Co. moves to confirm an award of arbitrators dated *June 8, 23, 1966*, against Multifacs International Traders, Inc. in the amount of $290,611.11, less $5,171.20, for breach of a time charter." 1967 A.M.C. at 129 (parentheses and footnote omitted). The court of appeals' phrase "[t]he *original* award" of "$265,795.64, less $5,171.20" (emphasis added), 375 F.2d at 581 n. 4, is clearly a reference to the June 8, 1966 award, containing a mistaken computation of war risk insurance and crew area bonuses, which the arbitrators "were properly permitted by the district court to revise," *id.* That revision took the form of the June 23 addendum (or Supplemental Award). We know that because the arbitrators described in a footnote their allowance of $132,356.07 for "unpaid war risk and crew area bonus" (the upwardly revised amount) "as amended by June 23, 1966 addendum to the award." 1967 A.M.C. at 146 n*.

We also know that the *Saxis* arbitrators corrected their miscalculation because the parties asked them to do so. We know that from Judge Dooling's discussion at 1967 A.M.C. 132–33:

It is argued that the arbitrators could not amend their award to correct an obvious error. The error consisted in a failure to use the figure for war risk insurance and crew area bonus that corresponded to their award of charter hire. It is true that arbitrators, unlike a court, are generally supposed to cease to exist as a tribunal as soon as they have delivered their award. But in the present case, as it happens, respondent, too, wished to have the award opened for a further damages hearing and did not oppose the reopening on the ground now urged. *Quite apart from that consideration, however,* the power to correct obvious error in the translation of its

own decision into an award-amount must inhere in the very nature of such a tribunal and, if it does not, in the Court which is asked to give their award effect.... In any case, the result reached now must be that, if need be, the award is corrected under 9 U.S.Code, sec. 11(a) to the extent indicated by the Supplemental Award.

(emphasis added; citations omitted).

While *Saxis* differs from the case at bar in that both owner and charterer asked the arbitrators for a further damages hearing, that does not serve to distinguish the point of principle upon which the district court decided the case and the court of appeals affirmed, namely, an arbitration panel's "power to correct obvious error in the translation of its own decision into an award-amount." And, if it be said that an order of court is necessary to give effect to a supplemental award correcting a miscalculation in the original award, the court's power to make such order is conferred, as Judge Dooling observed, by § 11(a) of the FAA.

Chairman Martin's letter on behalf of the arbitration panel, while acknowledging that the panel used an "erroneous" figure for fuel oil consumption, declined to modify the award "unless jointly requested by the parties to do so" (which will never occur) or "there is a court order stating that the Panel may reopen the Award and make further findings." In my judgment, the *Saxis* case teaches that the arbitrators at bar had the inherent power to deal with their error once it was pointed out to them, notwithstanding Stolt's recitation of that dread common law Latinism *functus officio*, a doctrine that Judge Dooling held did not and could not abrogate the arbitrators' inherent power.

## V

The foregoing analysis indicates that Laurin is entitled to some form of relief. I find some additional authority for that proposition in the cases cited by Laurin; and the cases cited by Stolt do not persuade me otherwise.

First, I am not persuaded that Laurin must be denied any relief under FAA § 11(a) because the arbitrator's "miscalculation of figures" (clearly "material" in amount) is not

"evident." The award recites on its face that the arbitrators based their calculations on a 51.7 ton *daily* consumption of fuel oil. Laurin states without contradiction that "a consumption of 51.7MT/day is grossly excessive for a vessel of 19,957MT deadweight", that being the MOUNTAIN BLOSSOM'S tonnage as stated in the charterparty; rather, so great a daily consumption is "roughly equivalent to that of a 150,000MT deadweight vessel," Reply Brief at 5 (citing two numbered Society of Maritime Arbitrators Awards in support of the latter factual assertion). It follows that calculating so large a daily amount of fuel oil consumption by so relatively small a vessel constitutes a "miscalculation" which was or should have been "evident" to anyone familiar with the industry, as these arbitrators surely were. Accordingly, assuming without deciding that in order to be "evident" under § 11(a) the arbitrators' miscalculation must "appear on the face of the award" (a phrase the statute does not use), that requirement is satisfied in the case at bar.

Even the cases cited by Stolt suggest, at least, a less inflexible approach. *Colonial Penn Insurance Co. v. Omaha Indemnity Co.*, 943 F.2d 327, 332 (3d Cir.1991), identifies as an exception to the *functus offico* doctrine an arbitrator's power to "correct a mistake which is apparent on the face of his award," an exception which the Third Circuit further defined as "applied to clerical mistakes or obvious errors in arithmetic computation," *id.* Given the record before them, the arbitrators made "an obvious error" in their "arithmetic computation" of the vessel's fuel consumption, an error which they promptly acknowledged.

In *Hough v. Merrill, Lynch, Pierce, Fenner & Smith*, 757 F.Supp. 283, 288 (S.D.N.Y. 1991), *aff'd*, 946 F.2d 883 (2d Cir.1991), Judge Conner said: "Where no mathematical error appears on the face of the award *and* where no computational error can be clearly inferred, an arbitration award will not be altered." (emphasis added). Judge Conner cited for that proposition *City of Troy v. Village of Menands*, 48 A.D.2d 733, 367 N.Y.S.2d 872, 873 (3d Dept.1975) where the court said: "Accordingly, since there are no mathematical errors on the face of the arbitrators' award *and* since no computational errors can be clearly inferred, this court cannot alter the final award ..." (emphasis added). In the case at bar, the circumstances compel the inference of the arbitrators' self-acknowledged computational error.

Other cases sanction judicial modification or correction of arbitration awards in circumstances analogous to those at bar. In *Atlantic Aviation, Inc. v. EBM Group, Inc.*, 11 F.3d 1276 (5th Cir.1994), the district court regarded itself as without power to modify or correct an arbitration award without affecting the merits of the dispute. The Fifth Circuit reversed and remanded to the district court with instructions to correct the arbitrators' award to reflect an amount concededly owed by one party to the other, which the arbitrators had omitted in calculating the award. The Fifth Circuit reasoned at 11 F.3d 1284:

> We find that the failure of the panel to award the balance remaining under the contract to Atlantic was in essence a clerical error which may be corrected without disturbing the merits of the arbitrators' decision. Neither party disputed that the money was owed, and the testimony of a majority of the arbitrators reveals that it was the panel's intention to offset the amount awarded to EBM by the amount EBM still owed to Atlantic. Correcting the award to reflect this intention neither changes the panel's findings that Atlantic breached its duty timely to deliver the aircraft to EBM nor affects the panel's award of $16,664 to EBM.

So in the case at bar, Laurin and Stolt agreed in their submissions to the arbitrators on the vessel's rates of fuel consumption to be used in calculating Laurin's damages. The arbitrators' error in transforming an undisputed sea passage consumption amount into a daily consumption amount may be regarded as clerical; and the court may fashion an appropriate remedy for Laurin without affecting or altering the arbitrators' resolution of the merits of the dispute.

Laurin also relies upon *Transnitro, Inc. v. M/V WAVE*, 943 F.2d 471 (4th Cir.1991), a charterparty arbitration case in which the

district court modified the arbitrators' award by adding one item of expense incurred in connection with the charter, but declined to add another. The Fourth Circuit affirmed the district court on the modification it had made to the award and remanded the case with instructions to make the other. Because the parties had failed to call either expense item to the arbitrators' attention, the errors in the award "were apparently not the fault of the arbitrators," 943 F.2d at 474; nor could they, in those circumstances, have appeared "on the face of the award." Nonetheless, the Fourth Circuit concluded that "there were, within the meaning of subsection [11](a), material mistakes made *in the arbitration proceeding* as to interest on the bond and, according to the owner, as to other expenses," and that the district court had "power under subsection (a) to do equity and justice." *Id.* The case is instructive because it shows that, in proper circumstances, a reviewing court may look beyond "the face of the award" to "the arbitration proceeding" to "do equity and justice." It is also worth noting the Fourth Circuit's observation that if the errors had been "the fault of the arbitrators," then "relief under 9 U.S.C. § 11(a) would have been available," a proposition for which it cited *Saxis Steamship Co., supra,* as authority. 943 F.2d at 474 and n. *.

## VI

I conclude that in the circumstances of this case, Laurin is entitled to relief, specifically under FAA § 11(a), and also in the light of the general language that appears in the last

sentence of that section.[9] The remaining question is what form that relief should take.

Laurin contends that the Court should enter an order correcting the award by making the upward adjustment to which Laurin claims it is entitled by the correct fuel consumption figures. I decline to do so.

While chairman Martin's letter to counsel acknowledged on behalf of the arbitration panel that "[t]he figure of 51.4MT used by the Panel appears to be erroneous," that letter expressly refused to accept Laurin's assertion as to what the correct figure should be. On the contrary, chairman Martin wrote on behalf of the arbitrators, "what should be the correct figure is not obvious or apparent based on the evidence submitted during the hearings."

Laurin now argues to the Court that I should disregard that assertion by the arbitrators as plainly wrong. While I confess to having some difficulty in understanding why the correct figure is not apparent from the evidence and submissions of counsel during the arbitration, *see* Point II *supra*, the fact remains that this issue goes squarely to the merits of the parties' dispute, and resolution of the merits is for the arbitrators, not for the Court. I have no reason to doubt that the arbitrators made their disclaimer in good faith.

The arbitrators make it clear in chairman Martin's letter that they are prepared to address their miscalculation and make further findings if directed by the Court to reopen the case. I think that, once they recognized their miscalculation, the arbitrators had the power under the Second Cir-

---

9. In *Transnitro*, 943 F.2d at 474, the shipowner contended that "the last sentence of 9 U.S.C. § 11 does not create an independent basis for modification by the district court, and that the district court is empowered to make such a modification only if the provisions of one of subparagraphs (a), (b) or (c) are met." The Fourth Circuit did not find it necessary to reach that question because it concluded that the case fell within subparagraph (a). The Second Circuit does not appear to have considered whether the last sentence of § 11 empowers a district court to modify or correct an arbitration award for reasons entirely independent of the particular circumstances described in subparagraphs (a), (b) and (c). An argument can be made that it does; were it otherwise, the last sentence adds nothing

to the section, which in its introductory paragraph empowers the court to act in the three specified circumstances.

In the case at bar, I need do no more than conclude that the last sentence of § 11 should not be disregarded as meaningless surplusage. At the very least, it authorizes courts to submit the "justice" of an award to a broader scrutiny than the narrow and inflexible review urged by Stolt. Judicial consideration of the pertinent circumstances recited in text, which demonstrate beyond peradventure of doubt the arbitrators' "material miscalculation of figures" remediable under subparagraph (a), is accordingly necessary to ensure obedience to the statutory mandate to "promote justice between the parties."

cuit's analysis in *Saxis* to issue a supplementary award without any order from this Court. In any event, a remand to the arbitrators so that they may address their own self-acknowledged miscalculation and develop such evidence as may be necessary to arrive at the correct figure is the better course for the Court to follow.

For the foregoing reasons, I conclude that where, as here, a material miscalculation of figures by arbitrators is evident upon the face of the award, or compelled by the circumstances of the case, and the arbitrators have themselves explicitly conceded their use of an erroneous figure, FAA § 11(a) gives the Court the power to remand the case to the arbitrators with directions to reopen the proceedings and to make further findings.

The case is respectfully remanded to the arbitrators for further proceedings consistent with this Opinion. This Court retains jurisdiction over any further applications that may be made.

It is SO ORDERED.